UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

CLAIRE LEBOWITZ and KEEGAN STEPHAN          FIRST AMENDED
                                            COMPLAINT
                        Plaintiffs,
                                            12CV8982 (JSR)
            vs.
                                            JURY TRIAL DEMANDED

CITY OF NEW YORK, NYPD Patrol Officer       ECF CASE
ADRIANNE EDWARDS Shield 06115, NYPD
Officer DOEs 1-10,

                        Defendants.

------------------------------------------------------------X

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................3

JURISDICTION AND VENUE .............................................................................13

JURY DEMAND ...................................................................................................13

PARTIES ...............................................................................................................14

STATEMENT OF FACTS......................................................................................15
   I. PLAINTIFFS' ARREST IN ZUCCOTTI PARK ...........................................15
   II. PLAINTIFFS' PRE-ARRAIGNMENT INNER EYE SCAN PUNISHMENT.................22
   III. CITY POLICY ...........................................................................................24

FIRST CLAIM FOR RELIEF – 1st and 4th Amendments .............................25

SECOND CLAIM FOR RELIEF – 6th Amendment............................................26

THIRD CLAIM FOR RELIEF – 14th Amendment .............................................27

FOURTH CLAIM FOR RELIEF – Municipal Liability .........................................28

Plaintiffs Claire Lebowitz ("Plaintiff LEBOWITZ") and Keegan Stephan ("Plaintiff STEPHAN") (collectively "Plaintiffs"), by their attorney, Paul L. Mills, Esq., for this Amended Complaint, complaining of the defendants, respectfully allege as follows:

SECOND AMENDED COMPLAINT

(Constitutional and civil rights lawsuit)

PRELIMINARY STATEMENT

1.      Plaintiff Claire Lebowitz is a 30-year-old woman, a United States citizen and a resident of Brooklyn, New York. A freelance waiter and actress, she has taught disadvantaged children in Afghanistan. At the time of the arrest, she had no prior criminal record.

2.      Plaintiff Keegan Stephan, is a 29-year-old man, a United States citizen and a resident of Brooklyn, New York. He is a volunteer with "Dogwalking for Rainforests." At the time of the arrest, he had no prior criminal record.

3.      The Plaintiffs were arrested for being part of an outdoor event with other people participating in the Occupy Wall Street ("OWS") movement, or observing their activities. The event was a peaceful, law-abiding expression of thought and feeling, which took place at Zuccotti Park (the "Park") when police barricades around Zuccotti Park, where the OWS movement was born, were removed. The activities, which were abundantly video-recorded and photographed, were a vigorous exercise of First Amendment rights in a public space, and included signs, artwork, and speaking, for a period of hours.  Police, who were also present in the Park, knew that the demonstrators were engaged in expressive activities protected by the First Amendment to the U.S. Constitution, and associational activities protected by the First and

Fourteenth Amendments to the U.S. Constitution. <u>See</u> Exhibit 2 – Photo - Occupy Wall Street Zuccotti Park Police Barricades Removed; and Exhibit 3 - Photo – OWS Takes Back Zuccotti Park.

4.      The barricades had gone up in mid-November, 2011; they came down the evening of January 10, 2012 after an OWS court victory; and people gathered in the park to be together – to talk about the event, and to show what they thought and felt to the public, which included news media who were also present there. Late that night, parts of the Park were largely deserted by the crowds, and it was here that the Plaintiffs were arrested.

5.      The barricades came down one day after attorneys representing OWS had drafted and served on the City Building Department a letter formally warning that the City was violating the law by barricading the park. <u>See</u> Exhibit 4 – NYCLU Letter to Commissioner Robert LiMandri.

6.      As the letter pointed out, NYPD was acting inconsistently with various laws and rulings governing the Park.

7.      Among these were the owner-issued Park rules, which demonstrated the exercise of some restraint when limiting the use of the park by, e.g., prohibiting "lying down on benches" only to the extent that such use "unreasonably interferes with the use of such areas by others." Exhibit 5 – Photo - Published Park Rules.

8.      That limitation is particularly significant in the context of this action, and of the arrest of the Plaintiffs giving rise thereto. *Inclusio unius exclusio unius est*.  Because lying down which unreasonably interferes with the use of such areas by others was prohibited, lying down which did *not* unreasonably interfere with the use of such areas by others was *not* prohibited.

9.      Under the circumstances here – OWS demonstrators lying down at 2 A.M. on a

January morning in the Park at a time when everyone there was either a demonstrator, a media observer, or a police officer, and, further, doing so in a largely deserted area of the Park – no reasonable officer could have objectively believed that the Plaintiffs, by lying down, were unreasonably interfering with the use of the area by others. An unreasonably reckless or incompetent officer might overlook the "interfering" element of the Park rules. An objectively reasonable officer would take time to read and understand the significance of the "interfering" element – twice repeated in the rules – as spelled out in plain English, when making an arrest decision. This was not a situation in which split-second judgments had to be made to protect the lives of fellow officers or members of the public. No 20-20 hindsight was required to read and understand the rules, prior to making an arrest. Any reasonable officer would have known that Plaintiffs' arrest for lying down without interfering with anyone's use of the area, was in violation of the Plaintiffs' rights under the First (freedom of speech and association), Fourth (protection against unreasonable search and seizure), and Fourteenth amendments (protection of liberty interests, including freedom of association) to the U.S. Constitution.

10.     The circumstances precluding a lawful arrest included the following:

11.     (a) the order, with regard to lying down, was unlawful;

12.     (b) there was no reason for the arresting officers to believe that the Plaintiffs were present in the Park at the time the order was given and heard police give the order;

13.     (c) the Plaintiffs were in compliance with the posted Park rules;

14.     (d) the Plaintiffs were in compliance with the lawful portions of the oral order (which they were not present to hear the police give);

15.     (e) there was no reason for the arresting officers to believe that was anyone in the area who might be annoyed by the Plaintiffs conduct, other than police.

16.    The same circumstances barred an arrest for Disorderly Conduct (New York PL §

240.20)[1]. Because arrest under that statute requires, at minimum, evidence of the possibility of

causing annoyance to a member of the public, the absence from the general vicinity of anyone

who might be annoyed is fatal to the lawfulness of an arrest on that basis, as any reasonable

officer would know.

17.    On or about 1:28 A.M. in the early morning of January 11, 2012, an NYPD

officer made an announcement by bullhorn to those in the Park. NYPD made a decision to

violate the demonstrators' rights by adding rules, which they, and those in the Park, knew were

not supported by the Park's rules. The police included that "you're not allowed to sit in the

Park."  See Exhibit 6 – Shapiro Video at 01:01.  No Park rule prohibited sitting down. Exhibit 5

– Photo - Published Park Rules.

18.    Indeed, by designating certain portions of the park as "sitting areas," the Park

rules specified that sitting down was permitted. They simply prohibited lying down in such

sitting areas to the extent that such lying down "unreasonably interferes with the use of such

areas by others." Exhibit 5 – Photo - Published Park Rules.

19.    Similarly, the police directed that the protesters were not allowed to be in

possession of "padding, which includes cardboard." See  Shapiro Video at 01:01. Again, no

owner rule, or court ruling, had prohibited the possession of cardboard in the park. As was

---

[1] § 240.20 Disorderly conduct.
  A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:
  1. He engages in fighting or in violent, tumultuous or threatening behavior; or
  2. He makes unreasonable noise; or
  3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or
  4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or
  5. He obstructs vehicular or pedestrian traffic; or
  6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or
  7. He creates a hazardous or physically offensive condition by any act

known to the police, cardboard was in use in the park for signs that the protesters were holding in their hands or propping up to be viewed by the public, media, or each other. See Exhibit 2 – Photo - Wall Street Zuccotti Park Police Barricades Removed.

20.    On information and belief, these unlawful directives were part of an ongoing NYPD tactic of announcing substantially unlawful orders, so as to induce demonstrators to disregard the unlawful parts of the orders, and then arrest them, falsely alleging violation of the valid parts of their orders. This is a variation of the "trap and arrest" tactic of arresting people who could not have heard alleged police orders, after leading them onto the bridge, such as was in use during the Brooklyn Bridge arrests on October 1, 2011. With this variation, orders may be audible, but they are audibly not lawful, and mislead the hearer into believing that if they comply with the valid parts of the order they will not be arrested. As with "trap and arrest", where police first escorted demonstrators onto the bridge, and led them to march in otherwise prohibited areas, this tactic creates confusion on the part of demonstrators who want to make their voices heard, but do not want to break the law.

21.    Such mixed lawful/unlawful orders also generate confusion or uncertainty as to the lawfulness of subsequent arrests, on which police may later rely in seeking qualified immunity against actions such as the one Plaintiffs herein have filed.

22.    Two minutes later, at 1:30 A.M., a similar order was given, stating "this is your final warning," and ordering, again without any legal basis, that it was unlawful to possess cardboard. Exhibit 6 – Shapiro Video at 02:02. This time, however, an additional unlawful element was added: that any such piece of cardboard "needs to be picked up, and thrown in the dumpster at this time."  This was an unlawful order that persons must destroy their own works of

_____

which serves no legitimate purpose.
 Disorderly conduct is a violation.

political expression, or face arrest, simply because they were in possession of them in a public space.

23.     On or about 1:35 A.M. that night, Plaintiffs entered, the park. They were coming from a nearby bar, The Blarney Stone, where they had been relaxing with their friends. They had not heard the police make the previous, unlawful announcements. They relaxed with their friends in a part of the Park comparatively uncrowded at that hour.

24.     On or about 2:06 A.M. that night, what appears to have been a park security guard made an announcement using a bullhorn. This man, wearing a lime-green vest, announced that bicycles could not be chained to anything in the park. He said nothing about lying down. Exhibit 6 – Shapiro Video at 05:10.

25.     At some point around 2:16 A.M., police observed that the Plaintiffs were lying down on a park bench-like structure.  Police were aware that people had entered the Park during the 45 minutes since they had given their unlawful order, because the police were present and able to see such people entering the Park. They made a decision not to repeat their warning prior to making an arrest.

26.     Police made a decision to proceed with an unlawful arrest.

27.     NYPD officer Defendants ADRIANNE and/or DOEs 1-5 walked up to the plaintiffs, and without warning, began to physically restrain them.

28.     The Plaintiffs did not resist in any way. They did not stiffen their arms or hold their arms tight at their sides to prevent handcuffing. They did not twist their bodies forward in an attempt to evade arrest and avoid handcuffing.

29.     Plaintiffs were then escorted by the police a matter of a few blocks to a waiting police van. They walked along with the police, as well as a small crowd of well-wishers, who

witnessed and recorded their cooperation with the police in walking to the NYPD van. <u>See</u> Exhibit 7 – Photo - Plaintiff STEPHAN Walking Escorted By Police to Van; Exhibit 8 – Photo - Plaintiff LEBOWITZ Walking Escorted By Police to Van; Exhibit 6 - Shapiro Video at 06:35. Plaintiffs did not refuse to walk to the NYPD van.

30.     Plaintiffs were taken in by the police and jailed to await arraignment. But when it came time to be arraigned, after all steps necessary to be arraigned had been completed, police asked them individually if they would consent to having their inner eye scanned and photographed by them.

31.     The proposed inner-eye scan was not necessary for their pre-arraignment identification.  Plaintiff LEBOWITZ was ultimately arraigned *without* having her inner eye scanned. On information and belief, Transaction Status Information provided as part of the arraignment package in New York City Criminal Court lists all such transmissions of such data and responses in return.  *No use was made* of Plaintiff STEPHAN's eye scan prior to his arraignment, <u>See</u> Transaction Status Information, Exhibit 10 – Plaintiff STEPHAN Arraignment Package at 6.

32.     Portions of the Plaintiffs' Arraignment Package that are attached as Exhibits 10 and 11 to this First Amended Complaint to prove the truth of certain matters despite the inaccuracy of their content.  For example, the statements of Defendant EDWARDS are offered to show that she filed false reports.  Plaintiffs offer these documents for consideration, but without waiving their right to argue that portions of the Arraignment Packages are not truthful or accurate.

33.     Nor was an inner eye scan necessary for gathering evidence of crime; preventing the destruction of evidence; or for preventing the surreptitious introduction of contraband into

the jails.

34.    Nor was it necessary to verify Plaintiffs' identities and criminal histories. Plaintiffs had already cooperated in pre-arraignment identification mug shot photos and fingerprinting.  They had orally provided personal information, and surrendered their government-issued driver's licenses with photo ID.  The police, prosecutors, and court, had each Plaintiff's rapsheet in hand.  See Exhibit 10 – Plaintiff STEPHAN Arraignment Package at 6; Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 5.  On information and belief, when an arrestee fails to provide police with adequate identification documents, they are arraigned as a "Doe" defendant. See, Exhibit 9 – Doe Arraignment Document. Neither Plaintiff was so arraigned. See, Exhibit 10 - Plaintiff STEPHAN Arraignment Package at 1; Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 1.

35.    On information and belief, there is no evidence that taking inner eye scans would reduce the possibility of arrestee escapes sufficiently to justify coercing pre-arraignment detainees to consent to such eye scans, as is alleged by NYPD. See Exhibit 12 – "Some Who Decline an Optional Iris Photo Are Kept Longer in Jail, Critics Say," New York Times, February 12, 2012, by Colin Moynihan.  Any number of additional steps might incrementally reduce the possibility of escapes through misidentification, e.g., voice prints; lie detector examinations; DNA samples; or handwriting analysis of specimen signatures. It is not plausible to conclude on the basis of existing evidence that all of these are necessary steps to arraignment, or that any one of them is a necessary step to arraignment, where the prisoner has already provided fingerprints, a photograph, and government-issued photo ID to the police. As noted above, *no use was made* of Plaintiff STEPHAN's inner eye scan in the fifteen minutes prior to his arraignment, at which time he was immediately released on his own recognizance. See Exhibit 10 – Plaintiff

STEPHAN Arraignment Package at 6.

36.     An unconsented pre-arraignment inner-eye scan, under these circumstances, was an unreasonable search of the Plaintiffs' persons and a violation of the Fourth Amendment. An attempt to coerce such consent by unlawfully prolonging their pre-arraignment detention was likewise a violation of the Fourth Amendment strictures against unlawful search, as well as against unlawful imprisonment. No objectively reasonable officer or official with knowledge of these circumstances could have participated or caused or approved or ratified this conduct without knowing it constituted violations of clearly established law.

37.     Plaintiffs each individually declined to give such consent, and, as a punishment, and as a method of unlawful coercion, the police prolonged their detentions and delayed their arraignments.

38.     Plaintiff Keegan Stephan was detained for approximately 24 hours until he consented to the photographic scan of his inner eye.  Then he was arraigned and released.

39.     Plaintiff LEBOWITZ was detained for approximately 36 hours and finally arraigned and released without a photographic scan being taken of her inner eye.

40.     No reasonable officer could have believed that under the circumstances of this case, at two o'clock of a January morning, Plaintiffs were interfering with any person's use of any part of Zuccotti Park, and Plaintiffs' arrest on that basis was unlawful, irregardless of the fact that they never heard the order unlawfully prohibiting them from lying down.

41.     While police may have discretion to expend time to accomplish the necessary steps to prepare for an arrestee's arraignment, up to as much as 72 hours, they do not have authority to prolong a prisoner's time in custody and delay their arraignment after those steps have been completed.

42.    New York CPL 140.20 provides that as to any warrantless arrestee, police "after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in the particular case" must bring him "before a local criminal court and file" a charging document.[2]

43.    Plaintiff STEPHAN's fingerprint information was provided to NYPD at 7:38 A.M., and his rapsheet was produced at 7:38 A.M., on January 11, 2012, 16 hours prior to his arraignment. See Exhibit 10 – Plaintiff STEPHAN Arraignment Package at 6. The charging document was signed by Defendant EDWARDS at 2:34 P.M. the same day. Id. at 2. He was arraigned at midnight, nine hours later, immediately after consenting to an inner eye scan. It is not plausible to conclude that his arraignment was delayed for any other reason than his declining to consent to an inner eye scan, since the eye scan was not used prior to his arraignment and release.

44.    Plaintiff LEBOWITZ's fingerprint information was provided to NYPD at 7:30 A.M. and her rapsheet was produced within seconds of that time, on January 11, 2012, more than 24 hours prior to her arraignment. Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 5. The charging document was signed by Defendant EDWARDS at 2:34 PM the same day. Id. at 2. She was arraigned at 9:30 A.M. the following morning, nineteen hours later, despite *refusing again* to permit the inner eye scan, and nine hours after Plaintiff STEPHAN – who was arrested at the same place and time, for the same conduct, by the same officer, and charged with the same crimes, but who consented to the inner eye scan. It is not plausible to conclude that her

---

[2] N.Y. CPL. LAW § 140.20 : NY Code - Section 140.20: Arrest without a warrant; procedure after arrest by police officer provides, in pertinent part: 1. Upon arresting a person without a warrant, a police officer, after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in the particular case, must except as otherwise provided in this section, without unnecessary delay bring the arrested person or cause him to be brought before a local criminal court and file therewith an appropriate accusatory instrument charging him with the offense or offenses in question. The arrested person must be brought to the particular local criminal court,

arraignment was delayed for any other reason than her declining to consent to an inner eye scan, or that such inner eye scan was necessary to either plaintiff's arraignment, since her arraignment in fact took place without the inner eye scan, and his took place without the eye scan being used.

45.     Plaintiffs bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their civil rights, as said rights are secured by said statutes and the Constitution of the United States.

## JURISDICTION AND VENUE

46.     This action arises under the First, Fourth, Sixth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §§ 1983 and 1988.

12. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 (federal question), and 1343 (federal civil rights).

13. The Southern District of New York is the proper venue for this lawsuit because the cause of action arose in New York County, New York. The acts complained of occurred in the City of New York and in the Southern District of New York. Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

Plaintiffs demand trial by jury in this action.

## PARTIES

---

or to one of them if there be more than one, designated in section 100.55 as an appropriate court for commencement of the particular action;

47.    Plaintiff Claire Lebowitz (Plaintiff LEBOWITZ) is a citizen and resident of the United States, and at all times relevant herein was a resident of the State of New York, Kings County.

48.    Plaintiff Keegan Stephan (Plaintiff STEPHAN) is a citizen and resident of the United States, and at all times relevant herein was a resident of the State of New York, Kings County.

49.    Defendant CITY of New York ("CITY") is a municipal corporation which, through its New York Police Department (the "DEPARTMENT") operates a number of subordinate law enforcement facilities.  The DEPARTMENT, through its senior officials, in each facility, and in its specialized units, promulgates and implements policies, including those with respect to the searches, arrests, and processing of pretrial detainees, and the reporting and investigation of lawful and unlawful arrests and processing of pretrial detainees, by uniformed officers including the individual NYPD officers who are defendants in this action.  In addition, senior officials in the DEPARTMENT are aware of and tolerate certain practices by subordinate officers, including some that are inconsistent with formal or stated policy.  These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten DEPARTMENT policies or customs.

50.    At all times relevant hereto, Defendant NYPD Patrol Officer ADRIANNE EDWARDS Shield 06115 ("EDWARDS") was a sworn and appointed patrol officer of the DEPARTMENT, acting in the capacity of agent, servant, and employee of Defendant CITY, within the scope of her employment as such, and acting under color of state law. Defendant EDWARDS is sued in her individual capacity.

51.    At all times relevant hereto, Defendant NYPD Officer DOEs 1-5 (as yet

unidentified NYPD Officers who were present during and assisted in Plaintiffs' arrests beginning on January 11, 2012, at about 1:30 o'clock AM, in Zuccotti Park, New York, NY) were sworn and appointed patrol officers of the DEPARTMENT, acting in the capacity of agent, servant, and employee of Defendant CITY, within the scope of their employment as such, and acting under color of state law. Defendant DOES 1-5 are sued in their individual capacity.

52.     At all times relevant hereto, Defendant NYPD Officer DOEs 6-10 (as yet unidentified NYPD Officers who were present during and assisted in the Plaintiffs' pretrial detainee processing on January 11-12, 2012, following their arrest at about 1:30 o'clock AM, in Zuccotti Park, New York, NY on January 11, 2012, and until Keegan Stephan's release from the New York City Criminal Court, 100 Centre Street, New York, NY at about 12:00 A.M. on January 12, 2012, and until Plaintiff Claire Lebowitz's release from the New York City Criminal Court, 100 Centre Street, New York, NY at about 9:30 A.M. on January 12, 2012) were sworn and appointed officers of the DEPARTMENT, acting in the capacity of agent, servant, and employee of Defendant CITY, within the scope of their employment as such, and acting under color of state law. DOEs 6-10 are sued in their individual capacity.


STATEMENT OF FACTS

I. PLAINTIFFS' ARREST IN ZUCCOTTI PARK


53.     On January 11, 2012 at about 1:35 o'clock A.M., Plaintiffs entered Zuccotti Park in downtown Manhattan, New York, NY, a place which was open to the public, including Plaintiffs, and lay down.

54.     Plaintiffs were there to be with their friends and fellow activists, who were

gathered that night because barricades blocking entry to Zuccotti Park had been removed that day, and they wanted to join with their fellow activists in celebration of that fact, to discuss the implications of that fact, and to express their thoughts and feelings about that fact, along with the others, all of whom were affiliated with or sympathetic to the Occupy Wall Street ("OWS") movement.

55.     At or about 2:16 A.M. the same morning, Defendant EDWARDS with the assistance of NYPD Officer DOES 1-5, seized Plaintiffs' persons and placed them in restraints, and escorted them to a nearby DEPARTMENT van, and placed them in the van, thereby arresting them.

56.     Plaintiffs did not resist the arrest or interfere with the actions of any police officer.

57.     Plaintiffs' arrests were made without probable cause to believe that any crime had been committed by them, or any other lawful basis for their arrests, and were done by Defendants EDWARDS and/or DOEs 1-5 in violation of Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution. No objectively reasonable officer or official with knowledge of these circumstances could have participated or caused or approved or ratified this conduct without knowing it constituted violations of clearly established law.

58.     Thereafter, Defendants EDWARDS and/or DOEs 1-5 then falsified documents to subject plaintiffs to the injury of criminal process. Defendant EDWARDS and DOEs 1-5 filed a report in which they made knowingly false statements that:

59.     (A) EDWARDS had observed Plaintiffs lying down in Zuccotti Park and that EDWARDS stated to Plaintiffs "You may not lie in the park" on three separate occasions over a one-hour period. See Exhibit 10 – Plaintiff STEPHAN Arraignment Package at 1; Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 1;

60. (B) that Plaintiffs refused to comply with said verbal instructions, See Exhibit 10 - Plaintiff STEPHAN Arraignment Package at 2, Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 1;

61. (C) that EDWARDS asked Plaintiffs to vacate Zuccotti Park; See Exhibit 10 - Plaintiff STEPHAN Arraignment Package at 2, Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 1;

62. (D) that Plaintiffs refused that request; See Exhibit 10 - Plaintiff STEPHAN Arraignment Package at 2, Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 1;

63. (E) that when EDWARDS was placing the Plaintiffs under arrest that both Plaintiffs stiffened their arms and held their arms tight at their sides to prevent handcuffing. See Exhibit 10 - Plaintiff STEPHAN Arraignment Package at 2, Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 2;

64. (F) that Plaintiffs twisted their bodies forward in an attempt to evade EDWARDS and avoid handcuffing. See Exhibit 10 - Plaintiff STEPHAN Arraignment Package at 2, Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 2;

65. (G) that Plaintiffs refused to walk to EDWARDS' police van. See Exhibit 10 - Plaintiff STEPHAN Arraignment Package at 2, Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 2.

66. On or about January 11, 2012 EDWARDS and/or DOES 1-5 prepared and filed reports falsely charging that she had personally witnessed the Plaintiffs in violation of PL 195.05 Obstruction of Governmental Administration in the Second Degree; PL 205.30 Resisting Arrest, and PL 140.05 Trespass, as set forth above. EDWARDS had been present during the arrests and was able to observe personally that the Plaintiffs had not engaged in the alleged conduct and/or

EDWARDS had not been present during the arrests and falsely stated that she had been present. Under these circumstances, EDWARDS' statements, prepared by her and/or DOEs 1-5, and made under oath, were knowingly false.

67.    These false statements and false reports by Defendants EDWARDS and DOEs 1-5 were intended to, and did, foreseeably cause the false imprisonment of Plaintiffs, in violation of their rights under the Fourth Amendment to the U.S. Constitution.

68.    The false arrests and imprisonments of Plaintiffs as set forth above were intended to punish Plaintiffs for their exercise of their rights to freedom of speech and expression under the First Amendment to the U.S. Constitution, and their rights of association under the First and Fourth Amendments to the U.S. Constitution, and were intended to and foreseeably would discourage and "chill" Plaintiffs or any person of reasonable firmness who wishes to engage in free speech and expressive activities from engaging in the exercise of those rights. The actions of Defendants EDWARDS and/or DOEs 1-5 as set forth above were in violation of the First and Fourteenth Amendments to the U.S. Constitution. No objectively reasonable officer or official with knowledge of the circumstances could have participated or caused or approved or ratified this conduct without knowing it constituted violations of clearly established law.

69.    When friends, family, or attorneys seek to contact someone who has been arrested, they are told by the police and court staff that the arrestee is being prepared for arraignment, and that a visit requires the arrestee's docket number, indicating they are in a holding area near the courtroom. That docket number can only be obtained by providing a clerk or police officer with the arrestee's name. If the exact name corresponding to the name on the paperwork is not given, the person inquiring will be told that the paperwork is not ready yet. This delays contact with the prisoner for hours, until the police finally relent and "discover" that the

prisoner has been held under the wrong name.

70.    Not only does this interfere with a prisoner's right to assistance of counsel under the U.S. Constitution Sixth Amendment, but the decision as to whether to release an arraigned prisoner on his own recognizance, or require bail for their release, and the amount of that bail, will be decided more adversely to the prisoner on the basis of whether they can state that they reasonably expect anyone they know to be present at the arraignment. See Plaintiff STEPHAN's arraignment package at 14, Criminal Justice Agency bail recommendation report to the Court, Defendant's Response Verification – CJA Recommendation Item 6, "Does the defendant expect someone at arraignment?" By making it impossible for friends and family to know where and when a prisoner will be arraignment, misidentifying the prisoner can result in his or her unreasonably not being released on bail or on their own recognizance, in violation of their U.S. Constitution Fourth Amendment protection against false imprisonment, and of their U.S. Constitution Fourteenth Amendment right of due process.

71.    While booking Plaintiffs, as set forth above, EDWARDS deliberately misstated Plaintiff LEBOWITZ's name, misspelling it as "Levowitz" rather than "Lebowitz", and also deliberately misstated Plaintiff (Keegan) STEPHAN's name, giving it as "James Stephan" rather than "Keegan Stephan", to make it difficult for the Plaintiffs' attorney, friends, or family, to ascertain their whereabouts, facilitate their release, or meet with the Plaintiffs prior to the Plaintiffs' arraignment, or for their attorney to protect them from being questioned by police without an attorney being present, or meet with them to advise them prior to their arraignment. . See Exhibit 11 - Plaintiff STEPHAN Arraignment Package at 1, Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 1.

72.    In fact, EDWARDS' and/or DOEs 1-5's conduct as set forth herein above did

19

delay and make more difficult a meeting between Plaintiffs and their attorney, and for their friends to ascertain their whereabouts and make contact with them.

73.    EDWARDS and/or DOEs 1-5 knew that the information she was giving was false and misleading, because both Plaintiffs had already surrendered to their driver's licenses in the course of their arrest, which showed their photographs, and set out their true names in full. Plaintiff STEPHAN's social security number and date of birth all accurately appear in his court paperwork. Likewise, Plaintiff LEBOWITZ's date of birth accurately appears in her court paperwork. See Exhibit 10 - Plaintiff STEPHAN Arraignment Package at 4-5, Exhibit 11 - Plaintiff LEBOWITZ Arraignment Package at 4.  It is not plausible that both the Plaintiffs contrived to conceal their names, while providing other accurate information for their identification. It is not plausible that by coincidence Defendant EDWARDS would have accidentally misstated *both* of the names of the two arrestees unlawfully arrested at the same place and time, on the same charges. It is not plausible that by coincidence the mistake Defendant EDWARDS made would be exactly the information needed by private citizens to locate and contact the Plaintiffs, and expedite their arraignments.

74.    On information and belief, the number of persons arrested in connection with Occupy Wall Street activities, whose names are inaccurately entered into their pre-arraignment paperwork, substantially exceeds the number who would, as a result of normal statistical probability, be inaccurately entered as the result of honest error.

75.    In the course of their pre-arraignment processing, both Plaintiffs repeatedly pointed out to NYPD officers that their names had been erroneously entered in the paperwork.

76.    On information and belief, the accurate completion of pre-arraignment paperwork by arresting and custody officers is closely monitored by NYPD supervisory personnel, and

officers are subject to reprimand for errors unless those errors are endorsed as a matter of policy.

77.    On information and belief, neither Defendant EDWARDS and/or DOEs 1-5, nor any other NYPD officer involved in the arrest or pre-arraignment custody of the Plaintiffs has received any reprimand or other discipline as a result of falsely arresting them, falsely charging them, fabricating false reports about them, or misidentifying them by name.

78.    It is not plausible to conclude that the misidentification of prisoners is not a practice and policy allowed and endorsed by those in control and authority over NYPD policy.

79.    Misidentifying the Plaintiffs, and prolonging their pre-arraignment detention, and interfering with their access to their attorney, as set forth above, was a violation by Defendant DOEs 6-10 of Plaintiffs' right to protection against false imprisonment, under the Fourth and Fourteenth Amendments to the U.S. Constitution and New York C.P.L. § 140.20 (1), and to their right to the assistance of counsel under the Sixth and Fourteenth Amendments to the U.S. Constitution and New York C.P.L. § 140.20 (1). No objectively reasonable officer or official with knowledge of these circumstances could have participated or caused or approved or ratified this conduct without knowing it constituted violations of clearly established law.

80.    On information and belief, as set forth hereinabove, Plaintiffs were the victim of a policy and practices maintained by DEPARTMENT, of deliberately misstating detainee names, to make it more difficult or impossible for a detainee's attorney, friends, or family, to ascertain their whereabouts, facilitate their release, or meet with a detainee prior to the detainee's arraignment (the "NYPD NAME POLICY").

///

///

///

## II. PLAINTIFFS' PRE-ARRAIGNMENT INNER EYE SCAN PUNISHMENT

81.     As set forth above, following their arrest at about 2:05 AM January 11, 2012, Plaintiffs were detained and booked by NYPD officers, in preparation for their arraignments in courtroom AR-3, Room 129 of the New York County Criminal Court, 100 Centre Street, New York, NY.

82.     In the course of being booked as set forth above, each of the Plaintiffs declined police demands to submit to a photographic scan of their inner eye.

83.     After all necessary steps had been completed for Plaintiffs' arraignments, and when in the ordinary course of events they would otherwise have been arraigned, on the evening of January 11, 2012, Defendant NYPD Officer DOEs 6-10 caused Plaintiffs detention in a locked facility to be prolonged, and they were not permitted to be arraigned.

84.     At about 12:00 A.M. on January 11, 2012, Plaintiff STEPHAN agreed to a demand that he allow a photographic scan be taken of his inner eye. Within 15 minutes thereafter, he was arraigned and released.

85.     After speaking with her attorney on the night of January 11, 2012, Plaintiff LEBOWITZ again declined to submit to a photographic scan of her inner eye, and NYPD Officer DOEs 6-10 caused her not to be arraigned, although she was ready for arraignment and would otherwise have been arraigned but for her declining the photographic scan of her inner eye.

86.     NYPD Officers DOEs 6-10 then caused Plaintiff LEBOWITZ to be held in custody a second night without being arraigned. The following morning, on January 12, 2012 at about 9:30 A.M., she again refused the inner eye scan. Fifteen minutes later she was arraigned

and released without having submitted to an inner eye scan.

87.    On information and belief, other persons arrested as a result of their participation in Occupy Wall Street activities have been threatened to have their arraignment delayed if they do not consent to inner eye scan. See Exhibit 12 - "Some Who Decline an Optional Iris Photo Are Kept Longer in Jail, Critics Say," New York Times, February 12, 2012, by Colin Moynihan.

88.    On information and belief, NYPD supervisory personnel closely monitor the pre-arraignment practices of custodial officers, and such officers are subject to reprimand if they engage in out-of-policy actions to delay the processing of arrestees.

89.    On information and belief, none of the Defendant officers who acted to prolong the pre-arrangement detentions of Plaintiffs or others have been reprimanded or otherwise disciplined for their unlawful conduct as set forth hereinabove.

90.    It is not plausible to conclude that the actions of the Defendant officers who acted to prolong the pre-arrangement detentions of Plaintiffs or others were other than in conformity with the endorsed practices and policies of the NYPD.

91.    On information and belief, Defendant NYPD Officer DOEs 6-10 were acting as set forth hereinabove pursuant policy and practices of maintained by NYPD of detaining arrestees in the custody of the NYPD without appearing before a judge for a longer period of time if they did not submit to a photographic scan of their inner eye, than they would if they did submit to a photographic scan of their inner eye (hereafter, the "NYPD INNER EYE SCAN POLICY").

92.    NYPD Officer DOEs 6-10 intended to and did prolong the Plaintiffs' pre-arrangement detention as a punishment for their refusal to submit to a photographic scan of their inner eye, on information and belief pursuant to the NYPD INNER EYE SCAN POLICY.

### III. CITY POLICY

93.     Defendant CITY, through its preparation and issuance of both formal and informal orders and directives, and through its formal and informal monitoring of officer activities, both mandated and was aware of the false arrests of persons engaged in First Amendment activity in the public spaces of New York City, such as Plaintiffs herein, and both caused, and failed to take sufficient steps to prevent, unlawful stops, searches, arrests, and imprisonments, including that of Plaintiffs as set forth herein.

94.     Defendant CITY, through its preparation and issuance of both formal and informal orders and directives, and through its formal and informal monitoring of officer activities, both mandated and was aware of the NYPD INNER EYE SCAN POLICY, and of the NYPD NAME POLICY, and failed to take sufficient steps to prevent, unlawful imprisonments and interference with a detainee's right to assistance by an attorney, including that of the Plaintiffs as set forth herein.

95.     The CITY was also aware, or should have also been aware of the failure of the DEPARTMENT to bring disciplinary charges against those officers who sanction or ignore unlawful stops, searches, arrests, imprisonments, and interference with a detainee's right to assistance by an attorney, to punish officers that sanction and/or cover up such unlawful stops, searches, arrests, imprisonments, and interference with a detainee's right to assistance by an attorney, and to discourage others from doing so.

96.     All of the aforementioned acts and omissions of defendants CITY, EDWARDS, and NYPD Officer DOEs 1-10, their agents, servants and employees, (hereafter, the "CITY

DEFENDANTS"), were carried out under the color of state law.

97.    All of the aforementioned acts of the CITY DEFENDANTS deprived the

Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by

the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983, as

explained herein below.

98.    The acts complained of were carried out by the aforementioned CITY

DEFENDANTS with all the actual and/or apparent authority attendant to official police.

99.    The acts complained of were carried out by the CITY DEFENDANTS pursuant to

the customs, usages, practices, procedures, and the rules maintained by CITY and the

DEPARTMENT, all under the supervision of ranking officers of said DEPARTMENT.

100.    The CITY DEFENDANTS, collectively and individually, while acting under

color of state law, engaged in conduct which constituted a custom, usage, practice, procedure or

rule of the respective municipality/authority, which is forbidden by the Constitution of the

United States.


<u>FIRST CLAIM FOR RELIEF</u>

42 U.S.C. § 1983/ First and Fourth Amendments

(Against Defendants EDWARDS and DOEs 1-5)


101.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully

set forth herein.

102.    Defendants EDWARDS and DOEs 1-5 acted under pretense and color of state

law and in their individual and official capacities and within the scope of their employments as

DEPARTMENT officers and employees.

103.    By reason of unlawfully seizing, stopping, searching, arresting, and imprisoning, and failing to intervene to prevent such unlawful seizure, stop, search, arrest, and imprisonment, when Plaintiffs were engaged in speech and association activities, Defendants EDWARDS and DOEs 1-5 deprived Plaintiffs of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the First Amendment to the United States Constitution to freedom of speech and association, and rights guaranteed by the Fourth Amendment to the United States Constitution to be free from unreasonable search, seizure, arrest or imprisonment without warrant or probable cause.

104.    As a direct and proximate result of the above misconduct, Plaintiffs were prevented from engaging in speech and expression and associating with their friends and fellow participants in the exercise of speech and expression; and deprived of their liberty; publicly embarrassed and humiliated; suffered pain and suffering, emotional injury, and were otherwise damaged and injured.

SECOND CLAIM FOR RELIEF

42 U.S.C. § 1983/ 6th Amendment

(Against Defendant ADRIANNE)

105.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth herein.

106.    By reason of unlawfully interfering with and obstructing Plaintiffs from meeting

with and receiving assistance from their attorney, Defendant EDWARDS deprived Plaintiffs of

rights, remedies, privileges, and immunities guaranteed to every citizen of the United States,

secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Sixth

Amendment to the United States Constitution to assistance of counsel.

107.    As a direct and proximate result of the above misconduct Plaintiffs were

prevented and delayed from meeting with their attorney; suffered pain and suffering, emotional

injury, and were otherwise damaged and injured.


## THIRD CLAIM FOR RELIEF

42 U.S.C. § 1983/ Fourteenth Amendment

(Against Defendants NYPD Officer DOEs 6-10)


108.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully

set forth herein.

109.    Defendant NYPD Officer DOEs 6-10 acted under pretense and color of state law

and in their individual and official capacities and within the scope of their employments as

DEPARTMENT officers and employees.

110.    By reason of unlawfully punishing Plaintiffs for declining to submit to

photography of their inner eye, and failing to intervene to prevent such punishment, Defendant

NYPD Officer DOEs 6-10 deprived Plaintiffs of rights, remedies, privileges, and immunities

guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not

limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to

protection against being deprived of liberty, without due process of law.

FOURTH CLAIM FOR RELIEF

MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983

(Against Defendant CITY)


111.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth herein.

112.    The CITY DEFENDANTS, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule maintained by the respective municipality/authority, that is, Defendant CITY and its DEPARTMENT, which is forbidden by the Constitution of the United States.

113.    Defendant CITY, through the DEPARTMENT, and acting under the pretense and color of law, has permitted, tolerated and been deliberately indifferent to a pattern and practice of unlawful seizures, stops, searches, arrests, imprisonments, and obstruction of assistance of counsel, by DEPARTMENT officers, including the individual CITY DEFENDANTS.  This widespread policy and tolerance of DEPARTMENT officers' unlawful seizures, stops, searches, arrests, and imprisonments of persons engaged in free speech and association activities, and obstruction of assistance of counsel, constitutes a municipal policy, practice or custom and led to Plaintiffs' unlawful seizure, stop, search, arrest, and imprisonment, and obstruction of assistance of counsel.

114.    By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom, pursuant to which Plaintiffs were subjected to unlawful seizure, stop, search, arrest, and imprisonment, and obstruction of assistance of counsel, and wrongfully

deprived of their freedoms of speech and association, of their liberty, and of their right to assistance of counsel, as set forth hereinabove, Defendant CITY has deprived Plaintiffs of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including but not limited to, rights guaranteed by the First, Fourth, Sixth and Fourteenth Amendments to the United States Constitution to be free from violation of their rights to free speech and association, and from search, arrest, or imprisonment without warrant or probable cause, to assistance of counsel, and from imprisonment without due process of law.

115.    At all times material to this complaint, Defendant CITY, acting through the DEPARTMENT, and through the Individual Defendants, maintained de facto policies, practices, customs, and usages of failing to properly train, screen, supervise, or discipline employees, and of failing to inform the individual CITY Defendants' supervisors of their need to train, screen, supervise or discipline said defendants.  These policies, practices, customs, and usages were a direct and proximate cause of the unconstitutional conduct alleged herein.

116.    The aforementioned customs, policies, usages, practices, procedures and rules maintained by Defendant CITY and the DEPARTMENT included, but were not limited to: (a) the NYPD INNER EYE SCAN POLICY as set forth hereinabove; (b) the NYPD NAME POLICY as set forth hereinabove; (c) displaying a deliberate indifference to disciplining supervisors, despite allegations of illegal and/or unconstitutional conduct including false arrests and imprisonments and the preparation of false official reports; of deprivation of liberty without due process of law; and of interference with assistance of counsel; such as Plaintiffs suffered.

117.    The foregoing customs, policies, usages, practices, procedures and rules maintained by Defendant CITY and the DEPARTMENT were the moving force behind the constitutional violations suffered by Plaintiffs as alleged herein.

118.    Additionally, the DEPARTMENT's deliberate indifference to proper training, supervising and/or disciplining of policy-making officials constituted explicit and/or tacit approval of their illegal and unconstitutional conduct.

119.    The acts complained of were a direct and proximate result of the usages, practices, procedures and rules maintained by Defendant CITY and the DEPARTMENT, which constituted deliberate indifference to the safety, well-being and constitutional rights of Plaintiffs.

120.    The foregoing customs, policies, usages, practices, procedures and rules maintained by Defendant CITY and the DEPARTMENT were the direct and proximate cause of the constitutional violations suffered by Plaintiffs as alleged herein.


WHEREFORE, Plaintiffs demand a jury trial and the following relief jointly and severally against all the defendants:

a.  Compensatory damages, in an amount to be determined by a jury;

b.  Punitive damages (except against Defendant CITY), in an amount to be determined by a jury;

c.  Costs and interest and attorney fees;

d.  Such other and further relief as this court may deem appropriate and equitable.


Dated:  New York, New York
        February 27, 2013                    /S/

                                    _____
                                    PAUL L. MILLS, Esq. (pm0653)
                                    Park West Finance Branch
                                    PO Box 20141
                                    New York, New York 10025
                                    (646) 637-3693
                                    plm36@columbia.edu
                                    Attorney for Plaintiffs