UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

CLAIRE LEBOWITZ and KEEGAN STEPHAN.,

                              Plaintiffs,

               -against-

CITY OF NEW YORK, POLICE OFFICER ADRIANNE
EDWARDS, Shield 611, NYPD OFFICER DOEs 1-10,

                            Defendants.

---------------------------------------------------------------------- x

**DEFENDANTS' LOCAL
RULE 56.1 STATEMENT OF
UNDISPUTED FACTS**

12 CV 8982 (JSR)

        Defendants City of New York and Adrianne Edwards by their attorney Michael A.

Cardozo, Corporation Counsel of the City of New York, submit this statement pursuant to

Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern

District of New York, setting forth the material facts to which they contend there is no

genuine issue to be tried.

1.      On the evening of January 10, 2012 the barricades that surrounded Zuccotti Park

were taken down.  (Exhibit A, ¶ 1).

2.      Plaintiff Lebowitz discovered the barricades had come down via twitter and

decided to go to the park to celebrate having access to the space.  (Exhibit C, 33-34).

3.      Separately plaintiff Stephan discovered that the barricades had come down and

biked to the park (Exhibit B, 32-33).

4.      Stephan hoped that people would be allowed to lie down in the park which would

allow activists associated with Occupy Wall Street to retake Zuccotti Park.  (Exhibit B, 98-

107).

5.      Prior to arriving at the park both plaintiffs were aware of a posted park rule that stated "The following types of behavior are prohibited in Zuccotti Park…  Lying down on the ground, or lying down on benches sitting areas or walkways which unreasonably interferes with the use of benches, sitting areas or walkways by others." (Exhibit 5, ¶ 8-9; Exhibit A, attachment 5; Exhibit B, 35: 8-20; Exhibit C, 38: 3-24).

6.      On arriving at the park plaintiffs estimate there were at least one hundred protestors in the park, twelve to twenty five police officers and twelve to twenty security guards. (Exhibit B, 34: 4-16; Exhibit C, 40-41).

7.      Plaintiff Lebowitz laid down with a group of approximately five people in a "cuddle puddle" when she arrived at the park and remained laying down for approximately fifteen minutes.  (Exhibit C, 42: 13-24).

8.      Plaintiff Lebowitz laid down on the ground near a group of approximately twenty individuals who were discussing the posted rule prohibiting laying down in the Park.  They likely used a "mic check" wherein one person makes a statement and the entire crowd repeats it to amplify their conversation.  Plaintiff Stephan was present in the park at this time.  (Exhibit C, 43-48).

9.      Lebowitz was only a few feet from the meeting which discussed whether an individual could be arrested for laying down, and concedes that she and the other individuals were aware of the meeting taking place.  (Exhibit C, 43: 21-24; 52: 12-24);

10.      Lebowitz also states that she discussed lying down in Zuccotti Park with plaintiff Stephan sometime between her arrival at the Park and the time plaintiffs left for the Blarney Stone Pub, specifically, plaintiff Stephan approached Lebowitz and others and

encouraged them to lie down as he had mentioned in his twitter feed.  (Exhibit C, 58: 4-59:12; Exhibit N).

11.    Lebowitz and Stephan left the park and proceeded to a bar called the Blarney Stone where they had drinks with friends.  While there Lebowitz discussed having successfully lied down in the park with a friend, and filled him in on the meeting of approximately twenty people who discussed lying down in the park.  (Exhibit C, 55-56).

12.    When plaintiffs returned to Zuccotti Park from the Blarney Stone Pub there were between fifty and one hundred protestors in the park.  Exhibit C, 67: 1-13).

13.    Plaintiff Lebowitz decided to lie down once again in the park upon returning.  She went to an area far away, at least a car length, from other protestors and laid down. (Exhibit C, 75: 9-11).

14.    After lying down, plaintiff was joined by Stephan who laid down next to her. (Exhibit C, 71-72);

15.    Within fifteen minutes of laying down Stephan and Lebowitz were approached by a security guard who told them to leave the park at least three times over the course of ten seconds to a minute.  (Exhibit C, 75-76, 78: 10-17).

16.    Lebowitz does not recall specifically what words the security guard said or plaintiffs said to the security guard other than the guard telling plaintiffs to leave the park. (Exhibit C, 76: 21-77:9).

17.    After being told to leave by the security guard, plaintiffs remained lying down in the park.  (Exhibit C, 77: 10-16).

18.    Plaintiff Stephan recalls no conversations with any security guards other than responding to a request regarding his bicycle.  (Exhibit B, 52: 19-22).

19.     Plaintiff Stephan recalls no conversations or statements between any security or police and protestors.  (Exhibit B, 48: 13-18).

20.     Plaintiff Stephan recalls no personal interactions with police prior to his arrest. (Exhibit B, 52: 14-18).

21.     Plaintiff Stephan does not know if any security guards approached him after he was lying down prior to his arrest.  (Exhibit B, 58: 1-5).

22.     Plaintiff Stephan was lying down in Zuccotti Park for less than a minute prior to him and Lebowitz being arrested.  (Exhibit B, 108: 12-17).

23.     Plaintiff Stephan was not aware of any security guards near him and Lebowitz from the time he laid down with Lebowitz until the time he was placed under arrest less than a minute later.  (Exhibit B, 108: 12-109:5).

24.     Plaintiff were placed under arrest and brought approximately one and a half blocks to a police van.  (Exhibit C, 82: 19-21).

25.     Once they arrived at the police van, plaintiffs went limp and lay on the sidewalk. (Exhibit C, 83:12-84:15, Exhibit F, Exhibit L).

26.     Plaintiff Stephan does not recall going limp and laying on the sidewalk at the van, but does recall being picked up to be put in the van.  (Exhibit B, 61:3-20, Exhibit L).

27.     Plaintiff Lebowitz described laying down instead of sitting in the van an act of passive resistance.  (Exhibit C, 84: 13-85:5).

28.     Plaintiffs were transported to and processed at the New York City Police Department Seventh Precinct.  (Exhibit B, 63: 15-20; Exhibit C, 87-88).

29.     Plaintiffs were subsequently transported to Central booking at approximately 10:45 a.m on January 11, 2012.  (Exhibit O, D185: ln 175, D194: ln 13).

30.     At Manhattan Central Booking both plaintiffs refused an iris scan on arrival. (Exhibit B, 69: 12-17; Exhibit C, 91: 23-92:8; Exhibit H);

31.     Plaintiff Lebowitz has never heard of any medical issues or injury resulting from the iris scans or photos, and does not know how it records images.  (Exhibit C, 93: 9-22).

32.     Plaintiff Stephan believes his iris was ultimately photographed or scanned in the Courtroom, but the process did not hurt, and to his knowledge caused no injury.  (Exhibit B, 78: 23-79:1).

33.     Prior to arraignment plaintiff Stephan placed a phone call to a friend who contacted his attorney, Mr. Mills, on his behalf.  (Exhibit B, 70: 2-17).

34.     Prior to arraignment plaintiff Lebowitz had not called for an attorney, but knew that a representative from the National Lawyers Guild, or NLG was being sent.  (Exhibit C, 100: 13-20; 101: 11-102: 6).

35.     Plaintiffs' attorney was present when both plaintiffs were brought to the Courtroom for arraignment and was able to represent them at that time.  (Exhibit B, 77: 19-22; Exhibit C, 103: 1-7; Exhibit J).

36.     Plaintiff Stephan was brought to the Courtroom in part AR3A at approximately 8:27 p.m. on January 11, 2012.  (Exhibit J; Exhibit O, D185: ln 175).

37.     On arrival in the Courtroom Stephan states that an officer told him he had to submit to an iris scan or he would be brought back downstairs.  (Exhibit B, 72: 17-23)

38.     Stephan does not know which of the two officers present told him the iris scan was compulsory (Exhibit B, 77: 6-8).

39.     Stephan cannot describe the second officer who told he had to submit to the iris photo, even by gender.  (Exhibit B, 76: 7-13).

40.     Stephan then believes he submitted to an iris verification scan, was seated in the Courtroom and arraigned.  (Exhibit B, 78: 18-20).

41.     The officer attempting to scan Stephan's eye took approximately one minute to do so and appeared like he was having trouble.  The officer took the photograph of Stephan's iris several times, and was communicating with the officer behind him, but Stephan does not recall what was said.  (Exhibit B, 79: 4-15).

42.     Stephan is not sure that he informed the officers that he had refused the initial enrollment iris photo.  (Exhibit B, 79: 22-80:6).

43.     Plaintiff Stephan was subsequently arraigned, and released late in the evening of January 11, 2012, at approximately 11:28 p.m.  (Exhibit B, 80:11-19; Exhibit H, Ex. 1; Exhibit J).

44.     Plaintiff Stephan was arraigned in a different Courtroom than Lebowitz and was ultimately released five minutes before night court ended.  (Exhibit B, 81: 17-82: 11, 83:23-84: 2).

45.     Stephan ultimately accepted an adjournment in contemplation of dismissal in this action.  (Exhibit B, 80: 20-81: 3).

46.     Plaintiff Lebowitz was initially brought to a be arraigned  at around 7:00 p.m. in the evening of January 11, 2012 along with approximately ten other prisoners.  (Exhibit C, 98: 5-9;  99: 19-100: 10; Exhibit O, D194, ln 13).

47.     Lebowitz was brought to Court Part AR1.  (Exhibit O, D194, ln 13).

48.     When asked if she would submit to a verification iris scan in the Courtroom on January 11, 2012, Lebowitz refused and was told to sit on the bench where people were waiting to be arraigned.  (Exhibit C, 98: 11-13; 99: 6-18).

49.     The first time Lebowitz was awaiting arraignment an individual sitting next to her had a seizure and had to be taken out of the Courtroom by medical personnel on a gurney. Courtroom proceedings stopped during this medical emergency.  (Exhibit C, 100: 21-102: 25).

50.     At approximately 9:07 p.m. Lebowitz and other prisoners were taken back to Central Booking when the Courtroom broke for dinner and then returned to the Courtroom at approximately to 11:00 p.m., described by plaintiff as a 30-90 minute break.  (Exhibit B, 103: 8-105: 9; Exhibit O, D194, ln 25).

51.     Lebowitz was again asked for her iris verification scan on her return to the Courtroom, she again refused.  (Exhibit C, 105: 10-12).

52.     Lebowitz is not aware of any other individuals who refused an iris scan at that time.  (Exhibit C, 105: 14-17).

53.     Lebowitz alleges that officer threatened to immediately send her upstairs to the cells if she did not submit to an iris scan.  Subsequently another officer directed her to sit on the bench with the other individuals awaiting arraignment.  (Exhibit C, 105: 18-107: 13).

54.     Lebowitz does not recall if she ever told any of the officers that she had refused the initial enrollment scan at the time of their requests for Courtroom verification scans. (Exhibit C, 109: 18-21).

55.     After a period of time Lebowitz was brought back to the cells from the Courtroom, unarraigned, at approximately midnight, along with other individuals who had been in the Courtroom with her and who, to her knowledge, had not refused the iris scan.  (Exhibit C, 108: 10-19; 110: 8-10).

56.     The next morning at approximately 6:00 a.m. Lebowitz was taken to Courtroom AR2 for Arraignment.  (Exhibit C, 110-111; Exhibit J).

57.     Lebowitz again refused the verification iris scan, was told to sit down and was shortly thereafter arraigned.  She was released at approximately 9:30 a.m. on January 12, 2012.  (Exhibit C, 110-111:14).

58.     Lebowitz ultimately accepted an adjournment in contemplation of dismissal in this action.  (Exhibit C, 113: 18-20).

59.     Plaintiff Lebowitz has not failed to attend any demonstrations, marches, meetings or other gatherings as a result of this arrest except one meeting with her boss regarding an upcoming trip.  She has participated in more than twenty Occupy Wall Street actions since this arrest. (Exhibit C, 117: 15-25; 112: 3-13).

60.     Plaintiff Stephan has engaged in between twenty to forty demonstrations or protests since his arrest.  (Exhibit B, 102: 1-21).

61.     The New York City Police Department has used iris photos since late 2010 to verify prisoner identity prior to arraignment.  (Exhibit H).

62.     Iris photos consist of a high resolution photo of the iris, the pigmented portion of the eye.  These photos are taken without making contact to the eye or exposing it to any bright lights, lasers or flashes.  (Exhibit H; Exhibit I).

63.     The iris photography has been used to stop mis-arraignments which resulted in at least six prisoners escaping custody without being arraigned between 2009 and 2010. (Exhibit H).

64.     Since the advent of the iris photos no prisoners have escaped by posing as another prisoner at the time of arraignment.  (Exhibit H).

65.     Iris photos are taken without making physical contact with the eye.  They are safe, have resulted in no known injuries, and rely on infrared light which is comparable to a television remote. (Exhibit H; Exhibit I).

66.     The iris photos are optional, and a prisoner is free to refuse them without penalty. (Exhibit H).

67.     When a prisoner is brought into central booking they are asked to submit to an enrollment iris photo.  This is the photo that would ultimately be matched up with the prisoner's courtroom verification photo.  (Exhibit H; Exhibit I).

68.     Only the last twenty verification photos scanned chronologically are saved, these are saved solely for diagnostic purposes.  (Exhibit I).

69.     Where there is no enrollment photo taken, prisoner identity is typically confirmed using prisoner photographs.  (Exhibit H).

70.     Plaintiff Stephan never had his iris photographed during his time as a prisoner on January 11, 2012.  (Exhibit H).

71.     Plaintiff Lebowitz never had her iris photographed during her time as a prisoner on January 11, 2012 and January 12, 2012.  (Exhibit H).

72.     Plaintiff Lebowitz was noted as a "DHO" at 1:00 a.m. on January 12, 2012 on her on-line prisoner arraignment form (OLPA).  (Exhibit H).

73.     A "DHO" is a docketed hold over, and is a code used when a Court Part has stopped arraigning prisoners resulting in the prisoner needing to be returned to a holding cell.  (Exhibit H).

74.     From the timing and designation as a DHO, Lebowitz's assigned court part on the evening of Janauary 11, 2012 stopped arraigning prisoners and she had to be returned to holding to be processed the following morning.  (Exhibit H).

75.     Lebowitz was lodged in Central Booking at approximately 10:46 a.m. on January 11, 2012.  (Exhibit O, D194: ln 13).

76.     There were two female prisoners who had been brought in prior to Lebowitz at 5:46 a.m. and 6:43 a.m. respectively.  No additional female prisoners were lodged in the cells from the time these two were until Lebowitz at 10:46 a.m.  (Exhibit O, D194: ln 11-12).

77.     These two prisoners were ultimately arraigned alongside plaintiff on the morning of January 12, 2012 from part AR2.  (Exhibit O, D196: ln 3, 10, 14).

78.     None of the female prisoners brought to central booking after plaintiff Lebowitz were brought to be arraigned before the morning of January 12, 2013, when plaintiff was ultimately arraigned.  (Exhibit O, D194: ln 16-24, D195: ln 26-28, D196: ln 1-14).

79.     Non-party Joseph Bassolino was arrested and convicted of trespass for laying down in Zuccotti Park and refusing to leave when ordered to in the early morning after plaintiffs' arrests on January 11, 2012.  (Exhibit D; Exhibit F; Exhibit K).

80.     On January 11, 2012 Zuccotti Park was a privately owned public space owned and maintained by Brookfield Properties.  The Courts had previously dealt with the status of Zuccotti Park and upheld trespassing violations within the park.  People v. Nunez, 943 N.Y.S.2d 857, 861.  (Exhibit D).

81.     On January 11, 2012, Robert Galvin was employed as a security guard by MSA

Security.  MSA Security was hired by Brookfield Properties to provide security for

Zuccotti Park.  (Exhibit G).

82.     Mr. Galvin had authority to enforce the rules of the park and to determine who

could remain on the premises.  (Exhibit G).

83.     Mr. Galvin saw plaintiffs on park property and told them it was against the rules to

lay down.  He subsequently asked them to leave several times when they remained lying

down.  (Exhibit G).

84.     Mr. Galvin informed police officers who informed plaintiffs they were in violation

of park rules and needed to exit the park.  (Exhibit G).

85.     Mr. Galvin witnessed police officers place plaintiffs under arrest when they refused

to comply, and provided his name and contact information to the officers to aid in the

prosecution.  (Exhibit G).

86.     Sergeant Imperatrice witnessed, *inter alia*, Mr. Galvin's orders that plaintiffs exit

the park, and plaintiffs failure to exit.  (Exhibit E).

  Dated:       New York, New York
                June 28, 2013

                           MICHAEL A. CARDOZO
                           Corporation Counsel of the City of New York
                           *Attorney for Defendants City of*
                           *New York and Adrianne Edwards*
                           100 Church Street
                           New York, New York 10007
                           (212) 356-2373

                  By:      _____/s/_____
                           Andrew Lucas
                           Assistant Corporation Counsel
                           Special Federal Litigation Division

TO:

Honorable Jed S. Rakoff
United States District Judge
500 Pearl Street
New York, New York 10007

Paul Mills Esq.
*Attorney for plaintiffs*
PO Box 20141
New York, NY 10025