| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br><br>-------------------------------------------------X<br><br>CLAIRE LEBOWITZ, et al.<br><br>                  Plaintiffs,<br><br>    vs.<br><br><br>CITY OF NEW YORK, et al.<br><br>               Defendants.<br><br>-------------------------------------------------X | | 12CV8982 (JSR)<br><br>ECF CASE |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiffs submit this response to the Defendants' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment. As part of this submission, the Plaintiffs also assert an independent set of undisputed facts.

TABLE OF CONTENTS

I. NYPD arrest of Plaintiffs Claire Lebowitz and Keegan Stephan ........................................1
  A. The unlawful city barricades came down. –Nos. 1-4 ............................................1
  B. The Park rules allowed people to lie down so long as they didn't interfere with others' reasonable use of the Park. – Nos. 5-6 ........................................................2
  C. Ms. Lebowitz lay down with others in a 'cuddle puddle.' – Nos. 7-10 ............................3
  D. Plaintiffs visited the Blarney Stone Bar ........................................................4
  E. Plaintiffs returned to Zuccotti Park – No. 12 ........................................................4
  F. Ms. Lebowitz and Mr. Stephan lay down a second time, this time far away from other people. – Nos. 13-14 ........................................................5
  G. A security guard ordered them to leave the park, without warning or explanation. – Nos. 15-16 ........................................................5
  H. Plaintiffs did not leave at that time, and remained laying down. – No. 17 ....................6
  I. Defendant NYPD Officer Adrianne Edwards arrested plaintiffs, without warning or explanation, at about 2 AM, January 11, 2012. – Nos. 18-23 ........................................6
  J. Plaintiffs walked with police, in custody, to a police van. – No. 24 ...............................7
  K. Police lifted the handcuffed plaintiffs into the van. – Nos. 25-27 ...............................7
  L. First, police took Plaintiffs to the 7th Precinct. – No. 28 ........................................8
  M. Next, police took Plaintiffs to Central Booking at about 10:45 AM. – No. 29 .............8
II. Punishment for iris scan refusal. ........................................................8
  A. At Central Booking, both Plaintiffs refused an iris scan, and police failed to take an iris scan of either Plaintiff. – Nos. 30-32 ........................................................8
  B. Both Plaintiffs sought counsel prior to arraignment. – Nos. 33-35 ...............................9
  C. Plaintiff Stephan was finally arraigned 21-1/2 hours after his arrest – No. 36 ...........10
  D. Two officers told Mr. Stephan he must submit to an iris scan, or he would go back to jail. – Nos. 37-39 ........................................................10
  E. Plaintiff Stephan submitted to an iris scan in the courtroom and was immediately arraigned and released. – Nos. 40-45 ........................................................12
  F. Ms. Lebowitz was brought out for arraignment at 7 PM, January 11, 2012, 17 hours after her 2 AM arrest. – Nos. 46-47 ........................................................13
  G. Ms. Lebowitz refused the iris scan the first time and was taken out of the courtroom and back to jail. – Nos. 48-50 ........................................................13
  H. She refused the iris scan a second time and was told she would not be arraigned if she refused the iris scan. – Nos. 51-54 ........................................................14
  I. After she refused the iris scan a seond time, Ms. Lebowitz was taken out of the courtroom to spend another night in jail. – Nos. 55-56 ........................................15
  J. The next morning, she again refused the iris scan, but was arraigned anyway at 9:30 AM, January 12, 2012, 31-1/2 hours after her arrest. – Nos. 57-60 ...............................16
III. Engineering principles of the iris scan. ........................................................17
  A. NYPD iris scans operate by making physical contact between the scanner's infra red radiation and the iris inside the subject's eye. – No. 61-62 ........................................17
  B. Pre-arraignment iris scans are an arbitrary procedure. ........................................21
    (1) Pre-arraignment iris scans could not prevent prisoners from escaping custody. – Nos. 63-65 ........................................................22
    (2) NYPD punished prisoners who refused pre-arraignment iris scans – No. 66 .........24

(3). The NYPD pre-arraignment iris scans were not "verification" photos. – No. 67 ...25

(4) NYPD kept courtroom iris scans in a permanent database. – Nos. 68-71 ...............26

C. Jail records are consistent with plaintiffs' claims. – Nos. 72-78 ...............................28

D. Plaintiffs were arrested without warning, unlike Joseph Bassolino. – No. 79 .............32

E. Security Guard / Custodian Galvin did not have legal authority to supersede posted Park rules, court decisions, and federal law and decide on his own who could be evicted from Zuccotti Park. – Nos. 80-86 ....................................................................................32

**Additional Facts Submitted in Opposition to Defendants' Motion for Summary Judgment** ..............................................................................................................................................38

**I. The individual defendant officer arrested Plaintiffs for lawful 1st Amendment Activity in a traditional public forum.** .......................................................................................................38

A. Zuccotti Park was a traditional public forum – No. 87 .................................................38

B. Plaintiffs lay down there lawfully. – Nos. 88-90 .........................................................39

C. Plaintiffs' laying down was a form of 1st Amendment expression. – No. 91 ............40

D. Defendant Edwards arrested Plaintiffs for laying down in the Park, not for laying down in front of a police vehicle. – Nos. 92-94 ..............................................................41

**II. Police issued orders in violation of the 1st Amendment, and that is what caused Plaintiffs' arrests.** ...................................................................................................................41

A. Police were already violating the 1st Amendment, prior to Plaintiffs' arrests. – Nos. 95-97 ..................................................................................................................................42

B. Defendant Edwards arrested Plaintiffs for violating the NYPD unlawful order. – No. 98 .......................................................................................................................................43

C. The unlawful NYPD orders were the consequence of an unlawful City practice and policy. – Nos. 99-102 .......................................................................................................43

D. The City's deliberately indifferent failure to train caused Plaintiffs' false arrests in violation of the 1st Amendment. – Nos. 103-107 ...............................................................43

F. Defendant City's pre-arraignment iris scans were unlawful. – Nos. 118-125 ..............45

E. The arresting officer concealed Plaintiffs from their friends and attorney by misstating their names. – Nos. 108-115 ...........................................................................47

E. The City's practice of concealing prisoners from their friends and attorneys violated Plaintiffs' rights. – Nos. 116-117 ...................................................................................49

**I. NYPD arrest of Plaintiffs Claire Lebowitz and Keegan Stephan{ TC "I. NYPD arrest of Plaintiffs Claire Lebowitz and Keegan Stephan" \f C \l "1" }**

**A. The city barricades came down.{ TC "A. The unlawful city barricades came down. –Nos. 1-4" \f C \l "2" }**

1. Plaintiffs do not dispute that on the evening of January 10, 2012 the barricades that surrounded Zuccotti Park were taken down. (Exhibit A, ¶ 1).

2. Plaintiffs do not dispute that Plaintiff Lebowitz discovered the barricades had come down via twitter and decided to go to the park to celebrate having access to the space. (Exhibit C, 33-34).

3. Plaintiffs do not dispute that separately, Plaintiff Stephan discovered that the barricades had come down and biked to the park (Exhibit B, 32-33).

4. Plaintiffs dispute the contention that "Stephan hoped that people would be allowed to lie down in the park which would allow activists associated with Occupy Wall Street to retake Zuccotti Park," and the cited evidence does not support that assertion. (Exhibit B, 98-107).]

The record includes evidence that, prior to coming to the Park on the evening of January 10, 2012, Plaintiff Stephan "tweeted" others, urging them to come to the Park and symbolically "retake" the Park as a public space where creative work and congregation to share ideas could take place, through the act of laying down there at midnight. This conduct was already allowed by the posted Park rules, so long as it didn't interfere with use of the Park by others. Exhibit B Part 1 at 38:20-39:16 (Zuccotti Park was "special"; a lot of activists came together and "were doing some of the most productive work I had seen them do in my years in New York City";

1

expression from the Park were "inspiring to me and productive"; he was "trying to figure out where to again congregate and how to continue to share ideas"; thinks that "public space is very important for expressing personal rights and sharing ideas") Exhibit B Part 2 at 98:24-99:11 (encouraged people to lie down in the park because "I wanted to see if we could stay there, if we could do the things that we needed to do to be there"; lying down was "a way to see if you could occupy the space"; but by the time he actually lay down with Ms. Lebowitz "that question had already been answered for me when I saw so many people lying down earlier in the evening." .

**B. The Park rules about laying down in the Park.{ TC "B. The Park rules allowed people to lie down so long as they didn't interfere with others' reasonable use of the Park. – Nos. 5-6"**

\f C \l "2" Nos. 5-6}

5. Plaintiffs do not dispute that, prior to arriving at the park both plaintiffs were aware of a posted park rule that stated "The following types of behavior are prohibited in Zuccotti Park… Lying down on the ground, or lying down on benches sitting areas or walkways **which unreasonably interferes with the use of benches, sitting areas or walkways by others**." (Exhibit 5, ¶ 8-9; Exhibit A, attachment 5; Exhibit B, 35: 8-20; Exhibit C, 38: 3-24).

6. Plaintiffs do not dispute that, on arriving at the park plaintiffs estimate there were at least one hundred protestors in the park, twelve to twenty five police officers and twelve to twenty security guards. (Exhibit B, 34: 4-16; Exhibit C, 40-41).

**C. Ms. Lebowitz lay down with others in a "cuddle puddle."**{ TC "C. Ms. Lebowitz lay

down with others in a 'cuddle puddle.' – Nos. 7-10" \f C \l "2" }

7. Plaintiffs do not dispute that Plaintiff Lebowitz laid down with a group of approximately five

people in a "cuddle puddle" when she arrived at the park and remained laying down for

approximately fifteen minutes. (Exhibit C, 42: 13-24).

8. Plaintiffs do not dispute that Plaintiff Lebowitz laid down on the ground near a group of

approximately twenty individuals. Plaintiffs dispute that the group were discussing the posted

rule **prohibiting laying down in the Park**. The cited evidence does not support that contention.

Plaintiffs do not dispute that they likely used a "mic check" wherein one person makes a

statement and the entire crowd repeats it to amplify their conversation. Plaintiffs do not dispute

that Plaintiff Stephan was present in the park at this time. (Exhibit C, 43-48).

The record includes evidence that Plaintiff Lebowitz was near a group of 20 discussing

the rule that **permitted laying down so long as it did not unreasonably interfere with others**.

Defendants' Statement No. 5, Exhibit C at 46:23-25 (the 20 were discussing "the rule about

laying down", not the rule "prohibiting" laying down.)

9. Plaintiffs do not dispute the contention that Lebowitz was only a few feet from the meeting

which discussed whether an individual could be arrested for laying down, and concedes that she

and the other individuals were aware of the meeting taking place. (Exhibit C, 43: 21-24; 52: 12-

24), although there is nothing to "concede" here. There is nothing damaging about Plaintiff

stating she listened to a discussion of whether people might be unlawfully arrested for engaging in conduct that is permitted by the Park rules.

10. Plaintiffs do not dispute that Lebowitz also states that she discussed lying down in Zuccotti Park with plaintiff Stephan sometime between her arrival at the Park and the time plaintiffs left for the Blarney Stone Pub, specifically, plaintiff Stephan approached Lebowitz and others and encouraged them to lie down as he had mentioned in his twitter feed. (Exhibit C, 58: 4- 59:12; Exhibit N).

**D. Plaintiffs visited the Blarney Stone Bar{ TC "D. Plaintiffs visited the Blarney Stone Bar"**

**\f C \l "2" – No. 11}**

11. Plaintiffs do not dispute that Lebowitz and Stephan left the park and proceeded to a bar called the Blarney Stone where they had drinks with friends. While there Lebowitz discussed having successfully lied down in the park with a friend, and filled him in on the meeting of approximately twenty people who discussed lying down in the park. (Exhibit C, 55-56).

**E. Plaintiffs returned to Zuccotti Park{ TC "E. Plaintiffs returned to Zuccotti Park – No.**

**12" \f C \l "2" }**

12. Plaintiffs do not dispute that when plaintiffs returned to Zuccotti Park from the Blarney Stone Pub there were between fifty and one hundred protestors in the park. Exhibit C, 67: 1-13).

**F. Ms. Lebowitz and Mr. Stephan lay down a second time, this time far away from other people.**{ TC "**F. Ms. Lebowitz and Mr. Stephan lay down a second time, this time far away from other people. – Nos. 13-14**" \f C \l "2" }

13. Plaintiffs do not dispute the contentions that Plaintiff Lebowitz decided to lie down once again in the park upon returning. She went to an area far away, at least a car length, from other protestors and laid down. (Exhibit C, 75: 9-11).

However, the record includes evidence that Ms. Lebowitz was far away from "most people," not just protestors. Exhibit C, 75:9 ("Far away. I had walked away from most people.")

14. Plaintiffs do not dispute that after lying down, plaintiff was joined by Stephan who laid down next to her. (Exhibit C, 71-72);

**G. A security guard ordered them to leave the park.**{ TC "**G. A security guard ordered them to leave the park, without warning or explanation. – Nos. 15-16**" \f C \l "2" }

15. Plaintiffs do not dispute that within fifteen minutes of laying down Stephan and Lebowitz were approached by a security guard who told them to leave the park at least three times over the course of ten seconds to a minute. (Exhibit C, 75-76, 78: 10-17).

16. Plaintiffs do not dispute that Lebowitz does not recall specifically what words the security guard said or plaintiffs said to the security guard other than the guard telling plaintiffs to leave the park. (Exhibit C, 76: 21-77:9).

**H. They did not leave at that time, and remained laying down.**{ TC "**H. Plaintiffs did not leave at that time, and remained laying down. – No. 17**" \f C \l "2" }

17. Plaintiffs do not dispute that after being told to leave by the security guard, plaintiffs remained lying down in the park. (Exhibit C, 77: 10-16).

**I. Defendant NYPD Officer Adrianne Edwards arrested Plaintiffs at about 2 AM, January 11, 2012.**{ TC "**I. Defendant NYPD Officer Adrianne Edwards arrested plaintiffs, without warning or explanation, at about 2 AM, January 11, 2012. – Nos. 18-23**" \f C \l "2" }

18. Plaintiffs do not dispute that Plaintiff Stephan recalls no conversations with any security guards other than responding to a request regarding his bicycle. (Exhibit B, 52: 19-22).

19. Plaintiffs do not dispute that Plaintiff Stephan recalls no conversations or statements between any security or police and protestors. (Exhibit B, 48: 13-18).

20. Plaintiffs do not dispute that Plaintiff Stephan recalls no personal interactions with police prior to his arrest. (Exhibit B, 52: 14-18).

21. Plaintiffs do not dispute that Plaintiff Stephan does not know if any security guards approached him after he was lying down prior to his arrest. (Exhibit B, 58: 1-5).

22. Plaintiffs do not dispute that Plaintiff Stephan was lying down in Zuccotti Park for less than a minute prior to him and Lebowitz being arrested. (Exhibit B, 108: 12-17).

23. Plaintiffs do not dispute that Plaintiff Stephan was not aware of any security guards near him and Lebowitz from the time he laid down with Lebowitz until the time he was placed under arrest less than a minute later. (Exhibit B, 108: 12-109:5).

**J. Plaintiffs walked with police, in custody, to a police van.**{ TC "**J. Plaintiffs walked with police, in custody, to a police van. – No. 24**" \f C \l "2" }

24. Plaintiffs do not dispute that Plaintiffs were placed under arrest and brought approximately one and a half blocks to a police van. (Exhibit C, 82: 19-21).

**K. Police lifted the handcuffed plaintiffs into the van.**{ TC "**K. Police lifted the handcuffed plaintiffs into the van. – Nos. 25-27**" \f C \l "2" }

25. Plaintiffs do not dispute that once they arrived at the police van, plaintiffs went limp and lay on the sidewalk. (Exhibit C, 83:12-84:15, Exhibit F, Exhibit L).

26. Plaintiffs do not dispute that Plaintiff Stephan does not recall going limp and laying on the sidewalk at the van, but does recall being picked up to be put in the van. (Exhibit B, 61:3-20, Exhibit L).

27. Plaintiffs dispute that Plaintiff Lebowitz described laying down instead of sitting in the van an act of passive resistance. (Exhibit C, 84: 13-85:5). The record includes evidence that Defendants' counsel so described it in his question, and although Ms. Lebowitz's answer was "I guess so," she also pointed out that "it's difficult to get to your feet when you are handcuffed." Exhibit C at 84:23-85:2.

**L. First, police took Plaintiffs to the 7th Precinct.**{ TC **"L. First, police took Plaintiffs to the 7th Precinct. – No. 28"** \f C \l "2" }

28. Plaintiffs do not dispute that Plaintiffs were transported to and processed at the New York City Police Department Seventh Precinct. (Exhibit B, 63: 15-20; Exhibit C, 87-88).

**M. Next, police took Plaintiffs to Central Booking at about 10:45 AM.**{ TC **"M. Next, police took Plaintiffs to Central Booking at about 10:45 AM. – No. 29"** \f C \l "2" }

29. Plaintiffs do not dispute that Plaintiffs were subsequently transported to Central booking at approximately 10:45 a.m on January 11, 2012. (Exhibit O, D185: ln 175, D194: ln 13).

**II. Iris scan refusal.**{ TC **"II. Punishment for iris scan refusal."** \f C \l "1" }

**A. At Central Booking, both Plaintiffs refused an iris scan, and police failed to take an iris scan of either Plaintiff.**{ TC **"A. At Central Booking, both Plaintiffs refused an iris scan, and police failed to take an iris scan of either Plaintiff. – Nos. 30-32"** \f C \l "2" }

8

30. Plaintiffs do not dispute that at Manhattan Central Booking both plaintiffs refused an iris scan on arrival. (Exhibit B, 69: 12-17; Exhibit C, 91: 23-92:8; Exhibit H);

31. Plaintiffs do not dispute that Plaintiff Lebowitz has never heard of any medical issues or injury resulting from the iris scans or photos, and does not know how it records images. (Exhibit C, 93: 9-22).

32. Plaintiffs do not dispute that Plaintiff Stephan believes his iris was ultimately photographed or scanned in the Courtroom. Plaintiffs' do not dispute that the process did not hurt, and to his knowledge caused no injury. (Exhibit B, 78: 23-79:1).  However, the record includes evidence that his knowledge of any injury was limited and may be inaccurate. Exhibit B at 78:23-79:1 (stating only that at the time of the deposition he was not aware of any physical injury from the iris process.)

**B. Both Plaintiffs sought counsel prior to arraignment.**{ TC "**B. Both Plaintiffs sought counsel prior to arraignment. – Nos. 33-35**" \f C \l "2" }

33. Plaintiffs do not dispute that, prior to arraignment plaintiff Stephan placed a phone call to a friend who contacted his attorney, Mr. Mills, on his behalf. (Exhibit B, 70: 2-17).

34. Plaintiffs do not dispute that prior to arraignment plaintiff Lebowitz had not called for an attorney, but knew that a representative from the National Lawyers Guild, or NLG was being sent. (Exhibit C, 100: 13-20; 101: 11-102: 6).

35. Plaintiffs do not dispute that Plaintiffs' attorney was present when both plaintiffs were brought to the Courtroom for arraignment and was able to represent them at that time. (Exhibit B, 77: 19-22; Exhibit C, 103: 1-7; Exhibit J).

## C. Plaintiff Stephan was finally arraigned 21-1/2 hours after his arrest.{ TC "C. Plaintiff Stephan was finally arraigned 21-1/2 hours after his arrest – No. 36" \f C \l "2" }

36. Plaintiffs dispute that Plaintiff Stephan was brought to the Courtroom in part AR3A at approximately 8:27 p.m. on January 11, 2012. (Exhibit J; Exhibit O, D185: ln 175). The record includes evidence that **Plaintiff Stephan was arraigned at about 11:30 PM,** 21-1/2 hours after his arrest, and three hours **after** 8:27 PM. Defendants' Statement of Fact No. 43.

## D. Two officers told Mr. Stephan he must submit to an iris scan, or he would go back to jail.{ TC "D. Two officers told Mr. Stephan he must submit to an iris scan, or he would go back to jail. – Nos. 37-39" \f C \l "2" }

37. Plaintiffs do not dispute that on arrival in the Courtroom Stephan states that an officer told him he had to submit to an iris scan or he would be brought back downstairs. (Exhibit B, 72: 17-23). See Plaintiffs' Response to No. 39 below.

38. Plaintiffs dispute that Stephan does not know which of the two officers present told him the iris scan was compulsory (Exhibit B, 77: 6-8), and the cited evidence does not support that contention. The record includes evidence that two officers told Mr. Stephan he would be taken out of the courtroom and back to jail if he did not submit to the iris scan. Exhibit B at 72:18-23. ("They" [those in the courtroom who attempted to take his iris scan] told him "If you don't do it, you are going to be brought back downstairs); Exhibit B at 75:1-4 (two officers discussed whether the iris scan was optional).

39. Plaintiffs dispute that Stephan cannot describe the second officer who told he had to submit to the iris photo, even by gender. (Exhibit B, 76: 7-13), and the cited evidence does not support that contention.  The record includes evidence that two officers told Mr. Stephan he would be taken out of the courtroom and back to jail if he did not submit to the iris scan. Exhibit B at 72:18-23.  ("They" [those in the courtroom who attempted to take his iris scan] told him "If you don't do it, you are going to be brought back downstairs); Exhibit B at 75:1-4 (two officers discussed whether the iris scan was optional).  **One officer was 5'10" in height, African-American, thin, in his thirties or forties.**  (Exhibit B at 72:5-17).  **The other officer was male.**  Exhibit B, 76:10-13 (believes the officer was male, not one hundred percent sure).

**E. Plaintiff Stephan submitted to an iris scan in the courtroom and was immediately arraigned and released.{ TC "E. Plaintiff Stephan submitted to an iris scan in the courtroom and was immediately arraigned and released. – Nos. 40-45" \f C \l "2" }**

40. Plaintiffs do not dispute that Stephan then believes he submitted to an iris verification scan, was seated in the Courtroom and arraigned. (Exhibit B, 78: 18-20).

41. Plaintiffs do not dispute that the officer attempting to scan Stephan's eye took approximately one minute to do so and appeared like he was having trouble. The officer took the photograph of Stephan's iris several times, and was communicating with the officer behind him, but Stephan does not recall what was said. (Exhibit B, 79: 4-15).

42. Plaintiffs do not dispute that Stephan is not sure that he informed the officers that he had refused the initial enrollment iris photo. (Exhibit B, 79: 22-80:6).

43. Plaintiffs do not dispute that Plaintiff Stephan was subsequently arraigned, and released late in the evening of January 11, 2012, at approximately 11:28 p.m. (Exhibit B, 80:11-19; Exhibit H, Ex. 1; Exhibit J).

44. Plaintiffs do not dispute that Plaintiff Stephan was arraigned in a different Courtroom than Lebowitz and was ultimately released five minutes before night court ended. (Exhibit B, 81: 17-82: 11, 83:23-84: 2).

45. Plaintiffs do not dispute that Stephan ultimately accepted an adjournment in contemplation of dismissal in this action. (Exhibit B, 80: 20-81: 3).

**F. Ms. Lebowitz was brought out for arraignment at 7 PM, January 11, 2012, 17 hours after her 2 AM arrest.{ TC "F. Ms. Lebowitz was brought out for arraignment at 7 PM, January 11, 2012, 17 hours after her 2 AM arrest. – Nos. 46-47" \f C \l "2" }**

46. Plaintiffs do not dispute that Plaintiff Lebowitz was initially brought to be arraigned at around 7:00 p.m. in the evening of January 11, 2012 along with approximately ten other prisoners. (Exhibit C, 98: 5-9; 99: 19-100: 10; Exhibit O, D194, ln 13).

47. Plaintiffs do not dispute that Lebowitz was brought to Court Part AR1. (Exhibit O, D194, ln 13).

**G. Ms. Lebowitz refused the iris scan the first time and was taken out of the courtroom and back to jail.{ TC "G. Ms. Lebowitz refused the iris scan the first time and was taken out of the courtroom and back to jail. – Nos. 48-50" \f C \l "2" }**

48. Plaintiffs do not dispute that When asked if she would submit to a verification iris scan in the Courtroom on January 11, 2012, Lebowitz refused and was told to sit on the bench where people were waiting to be arraigned. (Exhibit C, 98: 11-13; 99: 6-18).

49. Plaintiffs do not dispute that the first time Lebowitz was awaiting arraignment an individual sitting next to her had a seizure and had to be taken out of the Courtroom by medical personnel on a gurney. Courtroom proceedings stopped during this medical emergency. (Exhibit C, 100: 21-102: 25).

50. Plaintiffs dispute that at approximately 9:07 p.m. Lebowitz and other prisoners were taken back to Central Booking when the Courtroom broke for dinner and then returned to the Courtroom at approximately to 11:00 p.m., described by plaintiff as a 30-90 minute break. (Exhibit B [**sic**], 103: 8-105: 9; Exhibit O, D194, ln 25)., and the cited evidence does not support that contention. Exhibit C at 103:23 (taken "upstairs" at dinner break).  Exhibit O at D194 is a record of the prisoners in "1st Floor Females" Court Detention facility, not "Central Booking".

Plaintiffs request the Court to take judicial notice of the fact that Manhattan Central Booking is in the basement of the Criminal Courthouse at 100 Centre Street.

**H. She refused the iris scan a second time and was told she would not be arraigned if she refused the iris scan.**{ TC "**H. She refused the iris scan a second time and was told she would not be arraigned if she refused the iris scan. – Nos. 51-54**" \f C \l "2" }

51. Plaintiffs do not dispute that Lebowitz was again asked for her iris verification scan on her return to the Courtroom, she again refused. (Exhibit C, 105: 10-12).

52. Plaintiffs do not dispute that Lebowitz is not aware of any other individuals who refused an iris scan at that time. (Exhibit C, 105: 14-17).

53. Plaintiffs do not dispute that Lebowitz alleges that officer threatened to immediately send her upstairs to the cells if she did not submit to an iris scan. Subsequently another officer directed her to sit on the bench with the other individuals awaiting arraignment. (Exhibit C, 105: 18-107: 13).

54. Plaintiffs do not dispute that Lebowitz does not recall if she ever told any of the officers that she had refused the initial enrollment scan at the time of their requests for Courtroom verification scans. (Exhibit C, 109: 18-21).

**I. After she refused the iris scan a second time, Ms. Lebowitz was taken out of the courtroom to spend another night in jail.{ TC "I. After she refused the iris scan a seond time, Ms. Lebowitz was taken out of the courtroom to spend another night in jail. – Nos. 55-56" \f C \l "2" }**

55. Plaintiffs do not dispute that after a period of time Lebowitz was brought back to the cells from the Courtroom, unarraigned, at approximately midnight, along with other individuals who had been in the Courtroom with her.  Plaintiffs dispute the contention that the other individuals, to her knowledge, had not refused the iris scan. (Exhibit C, 108: 10-19; 110: 8-10).  The cited evidence does not support that contention. The record discloses only that she does not recall seeing others refuse the iris scan, not that to her knowledge the others had submitted to the iris scan. Exhibit C at 108:18-19.

56. Plaintiffs dispute that the next morning at approximately 6:00 a.m. Lebowitz was taken to Courtroom AR2 for Arraignment (Exhibit C, 110-111; Exhibit J), and the cited evidence does not support that contention.

The record includes evidence that **at 6 AM she was taken to another, crowded, smaller cell, where she was still being held 3 hours later at 9 AM.** Exhibit C Part 2 at 110:14-21.

**J. The next morning, she again refused the iris scan, but was arraigned anyway at 9:30 AM, January 12, 2012, 31-1/2 hours after her arrest.{ TC "J. The next morning, she again refused the iris scan, but was arraigned anyway at 9:30 AM, January 12, 2012, 31-1/2 hours after her arrest. – Nos. 57-60" \f C \l "2" }**

57. Plaintiffs do not dispute that Lebowitz again refused the verification iris scan, was told to sit down and was shortly thereafter arraigned. She was released at approximately 9:30 a.m. on January 12, 2012. (Exhibit C, 110-111:14).

58. Plaintiffs do not dispute that Lebowitz ultimately accepted an adjournment in contemplation of dismissal in this action. (Exhibit C, 113: 18-20).

59. Plaintiffs do not dispute that Plaintiff Lebowitz has not failed to attend any demonstrations, marches, meetings or other gatherings as a result of this arrest except one meeting with her boss regarding an upcoming trip. She has participated in more than twenty Occupy Wall Street actions since this arrest. (Exhibit C, 117: 15-25; 112: 3-13).

60. Plaintiffs do not dispute that Plaintiff Stephan has engaged in between twenty to forty demonstrations or protests since his arrest. (Exhibit B, 102: 1-21).

### III. Engineering principles of the iris scan.{ TC "**III. Engineering principles of the iris scan.**" \f C \l "1" }

### A. NYPD iris scan interaction between the scanner's infrared radiation and the iris inside the subject's eye.{ TC "**A. NYPD iris scans operate by making physical contact between the scanner's infra red radiation and the iris inside the subject's eye. – No. 61-62**" \f C \l "2" }

61. Plaintiffs dispute the contention that the New York City Police Department has used iris photos since late 2010 to verify prisoner identity prior to arraignment. (Exhibit H).

Firstly, Plaintiffs object to Exhibit H on hearsay grounds. Federal Rules of Evidence Rules 801 (a)-(c) (definition of hearsay); and 802 (hearsay not admissible). See below, Plaintiffs objections to Exhibit H (Declaration of Lt. Czark) and Exhibit I (Declaration of Nicholas Puccio) and the attached Exhibits H1, H2, I1 and I2 set forth below in Plaintiffs' Response to Defendants' Statement No. 62.

Second, while Plaintiffs do not dispute that NYPD might have **tried** to use iris photos to verify prisoner identity prior to arraignment, they haven't tried very hard, and the system basically can't do it.  The record includes evidence that because NYPD always allows prisoners to refuse booking iris scans, pre-arraignment iris scans cannot be used to verify the identity of prisoners who wish to escape by switching identities. See Defendants' Statement of Fact No. 66 below (iris photos are optional, and a prisoner is free to refuse them without penalty);

Defendants' Exhibit H, at ¶ 15 (without initial photo, subsequent verification by iris scan is impossible).

Third, the record includes evidence that because NYPD cannot compel any prisoner to submit to a booking iris scan, pre-arraignment iris scans cannot be used to verify the identify of prisoners **who wish to escape** by switching identities. Defendants' Exhibit H, at ¶ 15 (without initial photo, subsequent verification by iris scan is impossible).

Fourth, the record includes evidence that even when prisoners **submit** to the iris scanning process, the system may fail to obtain an iris scan. Defendants' Exhibit H-3 at D76 ¶ 2 (people who have had cataracts cannot have their iris photographed); at D77-79 ¶ 3 (iris photography will fail if subject has half-closed eyes, unfocussed eyes, looking aside, contact lenses, is taking certain medications). After he submitted to an iris scan, police for some reason were unable to obtain an iris scan from Plaintiff Keegan Stephan. Defendants' Statement of Fact at No. 40; (Plaintiff Stephan submitted to iris scan); Defendants' Exhibit H at ¶ 19 (no record of an iris photo from Plaintiff Stephan).

Fifth, the record includes evidence that mug shots, not iris scans, are what prevent prisoners from escaping custody as a result of misarraignment. Defendants' Statement of Facts No. 69, below (mug shots are used to identify prisoners at time of arraignment).

62. Plaintiffs do not dispute that iris photos consist of a high resolution photo of the iris, the pigmented portion of the eye. Plaintiffs dispute that these photos are taken without making contact to the eye and the cited evidence does not support that contention. Plaintiffs do not dispute that these photos are taken without exposing the eye to any bright lights, lasers or flashes. (Exhibit H; Exhibit I).

The record includes evidence that the iris is inside the eye, behind the eyelid, cornea, and aqueous humor, where the NYPD iris scanner's projected infrared light radiation, a form of physical energy, makes contact with it. Exhibit H at D75 ¶¶ 1-2.

The Court is requested to take judicial notice of the fact that infrared light waves are physical energy.

Plaintiffs object to Defendants' reliance on Exhibits H and I in support of these contentions, and the attached exhibits, on hearsay grounds.  Federal Rules of Evidence Rules 801 (a)-(c) (definition of hearsay); and 802 (hearsay not admissible). In Exhibit H, paragraph 2, Mr. Czark states that his declaration is based on four attached exhibits 1-4. In Exhibit I, paragraph 2, Mr. Puccio states that his declaration is based on two attached exhibits 1 and 2.

The Declarants' attached exhibits are competent evidence for **Plaintiffs** to offer as non-hearsay party admissions. FRE 801 (d)(2).  However, the statements they contain, out-of-court statements offered for the truth of the matter asserted, are hearsay as far as admission by the **Defendants** is concerned, and cannot be transformed into competent evidence for the Defendants simply by attaching them to an affidavit, or by inserting them into an affidavit. FRE 802.

The same is true of Lt. Czark's statements at Exhibit H, paragraphs 3 and 4 (purpose of the iris scan program's deployment in 2010 was to confirm prisoner identity and prevent escape by misarraignment). This is information that Lt. Czark, who does not allege he was a witness to the formulation of NYPD policy, is purporting to base on things he has been told, or documents he has read, i.e., hearsay. These are witnesses and documents which Defendants have not identified or produced either as Rule 26 Initial Disclosures, or in response to pertinent discovery requests, or identified in a privilege log.

The same is true of Lt. Czark's statements at Exhibit H, paragraphs 5 (at least 6 prisoners escaped by posing as other prisoners at time of arraignment in 2009-2010). This is information that Lt. Czark, who does not allege he was a witness to the escapes or their investigation, is purporting to base on things he has been told, or documents he has read, i.e., hearsay. These are witnesses and documents which Defendants have not identified or produced either as Rule 26 Initial Disclosures, or in response to pertinent discovery requests, or identified in a privilege log.

The same is true of Lt. Czark's statements at Exhibit H, paragraph 9 (iris cameras used only to match booking prisoners with arraignment prisoners) and 11-16 (use of iris cameras; consequences of refusal). This is information that Lt. Czark, who does not allege he was a witness to, or in control of, the use of the iris cameras or the photographs they took or the treatment of prisoners, is purporting to base on things he has been told, or documents he has read, i.e., hearsay.

Furthermore, these are witnesses and documents which Defendants have not identified or produced either as Rule 26 Initial Disclosures, or in response to pertinent discovery requests, or identified in a privilege log.

Defendants, in defending the lawfulness of the NYPD iris scans, depend exclusively on these contentions by Lt. Czark and Mr. Puccio about the health hazards, physical intrusiveness, use and purpose of iris scans. These contentions are all purportedly based on hearsay sources which Plaintiffs cannot cross-examine or otherwise impeach at trial, and they are inadmissible. FRE 801-802.

Plaintiffs also object pursuant to FRCP Rule 56 (c)(1)(B)(4) to Exhibit H, Affidavit of Christopher Czark, and Exhibit I, Affidavit of Nicholas Puccio on the grounds that the affidavits fail to show that the affiants are competent to testify on the matters stated. Both affidavits feature

statements about matters of scientific engineering. Rule 56 (c)(1)(B)(4) requires the Defendants to provide a statement in which the affiants explain their competency to testify as to the matters stated in Exhibit H paragraph 8 and Exhibit I, paragraph 5 (no known health risks; no physical contact); Exhibit H, paragraph 6 (infra red light used is "similar" to that used by television remote controls and safe); Exhibit I, paragraph 7 (iris photos used only to match prisoners at arraignment with prisoners at booking); Exhibit H, paragraph 10 and Exhibit I, paragraph 8 (iris photos are more accurate for identification than fingerprints, identifying prisoner nearly instantly). Mr. Czark's statement that he been employed by NYPD since 1993 and that he is currently a lieutenant in the Criminal Justice Bureau are not enough. Mr. Puccio's statement that he has been employed by NYPD for 5 years as a program manager in the Office of Information Technology is not enough.

Plaintiffs also object to the affidavit pursuant to FRCP Rule 56 (c)(1)(B)(2) (not admissible evidence) and the Court's Civil Case Management Plan Paragraph (D)(3) (no expert witnesses in this case).

Plaintiffs also object to the affidavit pursuant to FRCP Rule 56 (c)(1)(B)(2) (not admissible evidence) and (FRCP Rule 26(a)(1)(A)(i) (requiring timely initial disclosure of witnesses as to name, address, telephone number and subject of information the individual has that the disclosing party may use to support its defenses (Defendants' witness disclosures – served March 29, 2013, more than a month after the parties' February 19-20 Early Meeting of Counsel – failed to provide the latter category of disclosure as to any witness).

**B. Pre-arraignment iris scans.{ TC "B. Pre-arraignment iris scans are an arbitrary procedure." \f C \l "2" }**

**(1) Pre-arraignment iris scans as a method to prevent prisoners from escaping custody.{**

**TC "(1) Pre-arraignment iris scans could not prevent prisoners from escaping custody. –**

**Nos. 63-65" \f C \l "3" }**

63. Plaintiffs dispute the contention that the iris photography has been used to stop mis-arraignments which resulted in at least six prisoners escaping custody without being arraigned between 2009 and 2010.  (Exhibit H). Please see Plaintiffs' objection to Defendants' Statement of Fact No. 62.

The record includes evidence that because NYPD cannot obtain iris scans from prisoners who wish to conceal their identities, pre-arraignment iris scans cannot be used to verify the identity of prisoners who wish to escape by switching identities. See Plaintiffs Response to Defendants' Statement of Fact No. 61, above.

64. Plaintiffs dispute that any admissible evidence supports the contention that since the advent of the iris photos no prisoners have escaped by posing as another prisoner at the time of arraignment. (Exhibit H).

Please see Plaintiffs' objection on hearsay and other grounds to Exhibit H in response to Defendants' Statement of Fact No. 62.

65. Plaintiffs dispute that iris photos are taken without making physical contact with the eye. No admissible evidence supports the contention that they are safe, have resulted in no known

injuries, and rely on infrared light which is comparable to a television remote. (Exhibit H; Exhibit I).

As to the latter contention, please see Plaintiffs' Objections to Defendants' Statement of Fact No. 62.

As to whether iris photos are taken without making physical contact with the eye, the record includes evidence that the iris is inside the eye, behind the eyelid, cornea, and aqueous humor, where the NYPD iris scanner's projected infrared light radiation, a form of physical energy, makes contact with it.  Please see Plaintiffs' response to Defendants' Statement of Fact No. 62.

Plaintiffs request the Court to take judicial notice of the fact that infrared radiation damages eyes. "Radiation effects on the eye - Part 1 - Infrared radiation effects on ocular tissue", by Dr. Janet Voke, OPTOMETRY TODAY, May 21, 1999 at 23

http://www.optometry.co.uk/uploads/articles/33aa07d53d20b5cbc6f17ffc81f0dc94_ Voke1990521.pdf{ TA \l "\"Radiation effects on the eye - Part 1 - Infrared radiation effects on ocular tissue\", by Dr. Janet Voke, OPTOMETRY TODAY, May 21, 1999 at 23 http://www.optometry.co.uk/uploads/articles/33aa07d53d20b5cbc6f17ffc81f0dc94_ Voke1990521.pdf" \s "Voke" \c 8 }; Infrared Radiation: Defending Against the Invisible Workplace Hazard" by J. P. Sankpill, Protection Update/ News from the International Safety Equipment Association, October 2009

http://www.ussafety.com/media_vault/documents/1258397660.pdf{ TA \l "Infrared Radiation: Defending Against the Invisible Workplace Hazard\" by J. P. Sankpill, Protection Update/ News from the International Safety Equipment Association, October 2009 http://www.ussafety.com/media_vault/documents/1258397660.pdf" \s "Sankpill" \c 8 }.

**(2) NYPD treatment of prisoners who refused pre-arraignment iris scans.**{ TC "**(2) NYPD punished prisoners who refused pre-arraignment iris scans – No. 66**" \f C \l "3" }

66. Plaintiffs dispute that the iris photos are optional, and a prisoner is free to refuse them without penalty. (Exhibit H).

Firstly, no admissible evidence supports the contention.  See Plaintiffs' Objections to Exhibit H (hearsay, lack of foundation, violations of FRCP Rule 26) set forth above in Plaintiffs' Response to Defendants' Statement of Fact No. 62.

Second, the record includes evidence that refusing iris scans at the time of booking resulted in prolonged pre-arraignment detention:

(A) NYPD officers stated to Plaintiff Keegan Stephan that iris scan refusal would result in longer pre-arraignment detention; Defendants' Statement of Fact No. 37.

(B) NYPD officers stated to Plaintiff Claire Lebowitz that iris scan refusal would result in longer pre-arraignment detention; Defendants' Statement of Fact No. 53;

(C) NYPD officers stated to non-party witness Kevin Jones on January 28, 2012 (two weeks after Plaintiffs' arraignment) that iris scan refusal would result in longer pre-arraignment detention; Plaintiffs' Exhibit: Declaration of Kevin Jones at ¶ 2;

(D) NYPD officers stated to non-party witness Sebastian Rogers on November 16, 2011 (two months before Plaintiffs' arraignment) that iris scan refusal would result in longer pre-arraignment detention; Plaintiffs' Exhibit: Declaration of Sebastian Rogers at ¶ 4

(G) NYPD officers stated to witness Lorenzo Serna on December 12, 2011 (one month before Plaintiffs' arraignment) that iris scan refusal would result in longer pre-arraignment detention; Plaintiffs' Exhibit: Declaration of Lorenzo Serna at ¶¶ 3-4.

(H) NYPD did in fact prolong Ms. Lebowitz's pre-arraignment detention; Defendant's Exhibit C Part 2 at 105:10-13 (refused iris scan when brought to court for arraignment); at 107:25 (was brought upstairs); at 110:8-12 (spent another night in jail);

(K) NYPD did in fact prolong non-party witness Rogers' pre-arraignment detention. Plaintiffs' Exhibit: Declaration of Sebastian Rogers at ¶ 5 (brought into courtroom; refused iris photograph; led out again; arraignment delayed).

**(3). The NYPD use of pre-arraignment iris scans as verification photos.{ TC "(3). The NYPD pre-arraignment iris scans were not \"verification\" photos. – No. 67" \f C \l "3" }**

67. Plaintiffs do not dispute that when a prisoner is brought into central booking they are asked to submit to an enrollment iris photo.  Plaintiffs dispute that this is the photo that would ultimately be matched up with the prisoner's courtroom verification photo. (Exhibit H; Exhibit I).

Firstly, no admissible evidence supports the contention.  See Plaintiffs' Objections to Exhibit H and I (hearsay, lack of foundation, violations of FRCP Rule 26) set forth above in Plaintiffs' Response to Defendants' Statement of Fact No. 62.

Second, the record includes evidence that NYPD sought a courtroom iris photo from both plaintiffs, even though NYPD did not obtain a booking photo from either plaintiff.  Defendants' Exhibit H at ¶ 19 (no iris photo of Plaintiff Stephan); at ¶ 20 (no iris photo of Plaintiff Lebowitz). Without a booking iris photo, there was nothing to "verify." Defendants' Exhibit H ¶ 15.

Third, the record includes evidence that NYPD policy was to allow prisoners to refuse the booking iris scan, making any sort of "verification" by a second iris scan impossible. See Defendants' Statement of Fact No. 66 above (iris photos are optional, and a prisoner is free to refuse them without penalty). Without a booking iris photo, there was nothing to "verify." Defendants' Exhibit H ¶ 15.

## (4) NYPD treatment of courtroom iris scans with regard to a permanent database.{ TC "(4) NYPD kept courtroom iris scans in a permanent database. – Nos. 68-71" \f C \l "3" }

68. Plaintiffs dispute the contention that only the last twenty verification photos scanned chronologically are saved, these are saved solely for diagnostic purposes. (Exhibit I).

Firstly, no admissible evidence supports the contention.  See Plaintiffs' Objections to Exhibit I (hearsay, lack of foundation, violations of FRCP Rule 26) set forth above in Plaintiffs' Response to Defendants' Statement of Fact No. 62.

Second, Defendants' responses to discovery demands for documents evidencing NYPD policies for obtaining and maintaining iris scan records support the contention that they are

routinely saved to a permanent database, and never discarded. Defendants' Exhibit H-3 at D74 ("This process takes only seconds and captures details of the iris that are mapped, recorded and stored for future matching procedures."; at D77 ("Iris images are stored in the system database for archive purposes."); Defendants' Defendants' Exhibit H-4 at D61 ("the irises of all prisoners will be photographed and entered into the department's database"; at D66 (instructions on reviewing quality of iris capture before submitting record to database, "because it will later be rejected by the database"; at D67 ("Criminal Justice Bureau personnel will use a handheld "Pier-T" iris camera to verify an individual's identity immediately before arraignment. The iris software sends information to zOLPA to confirm whether the individual is a match or mismatch."); Plaintiffs' Exhibit: Defendants' Responses to Requests for Admission No. 1 (admitting that "At the time of the incidents giving rise to Plaintiff's complaint, NYPD procedure was to place every iris swcan NYPD obtained in a permanent database."); Declaration of Paul L. Mills at ¶ 2 (stating that in response to Plaintiffs' Request for Production No. 1(j) of every communication and document discussing or memorializing "NYPD practice or policy as to obtaining an inner eye scan of any prisoner prior to initial arraignment, including the preparation, transmission, reception, and filing of any Document or Communication for that purpose, or as the result of such inner eye scan, in effect during the period of January 10-12, 20-12" that Defendants produced **no** materials providing for discarding or destroying any such prisoner inner eye scan file **at any time**).

Third, the record includes evidence that NYPD officers sought iris scan photographs at the time of arraignment, even though there were no prior booking iris scan photographs, which supports the contention that the so-called "verification" photos were intended for some other purpose.  See Plaintiffs' response above to Defendants' Statement No. 67.

69. Plaintiffs do not dispute that where there is no enrollment photo taken, prisoner identity is typically confirmed using prisoner photographs. (Exhibit H).

70. Plaintiffs dispute the contention that Plaintiff Stephan never had his iris photographed during his time as a prisoner on January 11, 2012. (Exhibit H).

The record includes evidence that NYPD officers photographed the iris of Plaintiff Keegan Stephan. Statement of Fact at No. 40; (Plaintiff Stephan submitted to iris scan).

71. Plaintiffs do not dispute that Plaintiff Lebowitz never had her iris photographed during her time as a prisoner on January 11, 2012 and January 12, 2012. (Exhibit H).

**C. Jail records are consistent with plaintiffs' claims.{ TC "C. Jail records are consistent with plaintiffs' claims. – Nos. 72-78" \f C \l "2" }**

72. Plaintiffs dispute the contention that Plaintiff Lebowitz was noted as a "DHO" at 1:00 a.m. on January 12, 2012 on her on-line prisoner arraignment form (OLPA). (Exhibit H).
The record includes evidence that Plaintiff Lebowitz was noted as "**IRIS NOT TAKEN**, DHO". Exhibit H2 (emphasis added).

73. Plaintiffs dispute in part the contention that a "DHO" is a docketed hold over, and is a code used when a Court Part has stopped arraigning prisoners resulting in the prisoner needing to be returned to a holding cell. (Exhibit H).

The record includes evidence that DHO is a code used when a prisoner is returned to a holding cell for refusing the iris scan. Exhibit H2 (On Line Prisoner Arraignment record stating Ms. Lebowitz was "**IRIS NOT TAKEN**, DHO"; see Plaintiffs' response to Defendants' Statement of Fact No. 66 (NYPD had a policy of punishing prisoners who refused the iris scan by prolonging pre-arraignment detention).

74. Plaintiffs' dispute the contention that from the timing and designation as a DHO, Lebowitz's assigned court part on the evening of January 11, 2012 stopped arraigning prisoners and she had to be returned to holding to be processed the following morning. (Exhibit H).

The record includes evidence supporting the contention that Ms. Lebowitz was returned to holding as a punishment because she refused the iris scan, and not because the court part stopped arraigning prisoners.  See Plaintiffs' Response to Defendants' Statement Nos. 66 and 73, above.

No admissible evidence supports the Defendants' contention.  See Plaintiffs' Objections to Exhibit H (hearsay, lack of foundation, violations of FRCP Rule 26) set forth above in Plaintiffs' Response to Defendants' Statement of Fact No. 62.

75. Plaintiffs dispute that Lebowitz was lodged in Central Booking at approximately 10:46 a.m. on January 11, 2012. (Exhibit O, D194: ln 13), and the cited evidence does not support that contention. Exhibit O at D194 (jail record for the **1st Floor Female's Court Detention Facility, not Central Booking**); Exhibit O at D186 (Central Booking record for January 11, 2012, stating no record of Ms. Lebowitz being lodged in Central Booking on January 11, 2012.)

The record includes evidence that Ms. Lebowitz was lodged in the facility referenced in the cited evidence (1st Floor Female's Court Detention Facility) three separate times:

first at approximately 10:46 AM on January 11, 2012, [Exhibit O at D194, line 16] then

a second time at approximately 9:07 PM the same day, [Exhibit O at D194, line 28] and then

a third time at 12:15 AM the next morning on January 12, 2012. [Exhibit O, at D196 line 14].

76. Plaintiffs do not dispute that there were two female prisoners who had been brought in prior to Lebowitz at 5:46 a.m. and 6:43 a.m. respectively. Plaintiffs dispute the contention that no additional female prisoners were lodged in the cells from the time these two were until Lebowitz at 10:46 a.m. (Exhibit O, D194: ln 11-12) and the cited evidence does not support that contention.

The record includes evidence that there were thirteen, not two, female prisoners who had been brought into the 1st Floor Females Court Detention Pen and lodged there prior to Ms. Lebowitz. Exhibit O at D194 lines 1-16.

77. Plaintiffs dispute that these two prisoners were ultimately arraigned alongside plaintiff on the morning of January 12, 2012 from part AR2, (Exhibit O, D196: ln 3, 10, 14), and the cited evidence fails to support that contention. Exhibit O, D196 (no information about arraignment – see below.)

The cited evidence fails to disclose information about arraignment. Exhibit O at D194 lines 16 (showing Ms. Lebowitz's "Time Out" as 7:00 PM, with "Remarks" of "AR1"), 28 (showing her "Time Out" as 11 PM with "Remarks" of "AR2") and at D196 line 14 (indicating her "Time Out" as 5:50 AM with "Remarks" of "AR2"), all together showing that just because this Pen Record indicates a "Time Out" and an arraignment courtroom, that doesn't mean the prisoner was arraigned at a given time or in a given courtroom.

78. Plaintiffs dispute that none of the female prisoners brought to central booking after plaintiff Lebowitz were brought to be arraigned before the morning of January 12, 2013, when plaintiff was ultimately arraigned. (Exhibit O, D194: ln 16-24, D195: ln 26-28, D196: ln 1-14).  See Plaintiffs' response to Statement of Fact No. 77 (Court Detention Pen Record fails to indicate where or when any prisoner was arraigned).

The record includes evidence that **12 prisoners** were brought in **after** Ms. Lebowitz was brought in (at 1046 AM, Exhibit O at D194 item no. 13), and taken out **before or at the same time** as she was (at 0550 AM, Exhibit O at D196, item no. 14), including **11** who were brought in **7 or more hours after** she was:

(1) The prisoner whose name will be redacted here to the initials "LM" was brought into the cell 4 hours after Ms. Lebowitz, at 1440 AM, and taken out at 1900 PM, 11 hours before her; Defendants' Exhibit O at D194 item no. 14;

(2) Prisoner "VJ" was brought into the cell 8 hours after Ms. Lebowitz at 1653 PM and released 7 hours before her at 2254 PM; Defendants' Exhibit O at D194 item no. 17;

(3-12) 10 prisoners were released at the same time as Ms. Lebowitz, despite being brought into

this cell 7 hours after her (prisoner AL, Defendants' Exhibit O at D194 item no. 16, D195 item

no. 27) 8 hours after her (prisoner CI, Defendants' Exhibit O at D194 item no. 18, D196 item no.

5), 9 hours after her (Prisoners MH, AW, CG, Defense Exhibit O at D194 item nos. 19, 20, 21, at

D196 item nos. 4, 12, 2), 10 hours after her (Prisoner KB, Defendants' Exhibit O at D194 item

no. 22, at D196 item no. 1), and 11 hours after her (Prisoners TR, ST, IS, and RK, Defendants'

Exhibit O at D194 item nos. 23, 24, 26, 28, at D196 item nos. 8, 11, 9, 6).


**D. Arrest of Joseph Bassolino.**{ TC "**D. Plaintiffs were arrested without warning, unlike**

**Joseph Bassolino. – No. 79**" \f C \l "2" }


79. Plaintiffs do not dispute that non-party Joseph Bassolino was arrested and convicted of

trespass for laying down in Zuccotti Park and refusing to leave when ordered to in the early

morning after plaintiffs' arrests on January 11, 2012. (Exhibit D; Exhibit F; Exhibit K).


**E. Security Guard / Custodian Galvin's legal authority to decide who could be evicted from**

**Zuccotti Park.**{ TC "**E. Security Guard / Custodian Galvin did not have legal authority to**

**supersede posted Park rules, court decisions, and federal law and decide on his own who**

**could be evicted from Zuccotti Park. – Nos. 80-86**" \f C \l "2" }


80. Plaintiffs do not dispute that on January 11, 2012 Zuccotti Park was a privately owned public

space owned and maintained by Brookfield Properties. Plaintiffs dispute the contention that the

Courts had previously dealt with the status of Zuccotti Park and upheld trespassing violations within the park. People v. Nunez, 943 N.Y.S.2d 857, 861. (Exhibit D), and the cited evidence does not support these contentions. Defendants' Exhibit D at Request No. 12 (Plaintiffs admit that the *Nunez* Court stated that Zuccotti Park is a **privately-owned public space owned and maintained by Brookfield Properties**, but nothing asked of or answered by Plaintiffs concerning **trespassing violations** within the park**.**)

The record includes evidence that**:**

(1) in *Nunez* the Court denied a motion to dismiss the criminal complaint (charging that Defendant, Ronnie Nunez, with Trespass, for different conduct than that of Plaintiffs' here) as defective on its face. The *Nunez* court did **not** "uphold trespassing violations within the park", as no trial or conviction had yet taken place. *People v. Nunez*, 943 N.Y.S.2d 857, 861 (2012); and

(2) in *Nunez*, the Court noted that in a prior proceeding, Waller *v. City of New York*, 34 Misc.3d 371, 374, 933 N.Y.S.2d 541 [NY Cty. SCT 2011], "the Occupy Movement" had attempted and **failed to obtain a TRO to be placed back in possession of the park and enjoining the City and Brookfield Management from evicting them in the future**.  However, in *Nunez*, the Court did **not** note that in a prior proceeding "the Courts" had **upheld any trespassing violations** within the park; *People v. Nunez*, 943 N.Y.S.2d 857, 861 (2012); and

(3) in fact, in *Waller*, the Court denied a TRO allowing Occupy supporters to reside in Zuccotti Park, but did **not** "uphold trespassing violations within the park," as the question of criminal

charges or convictions was not before the court in this civil proceeding. *Waller v. City of New York*, 34 Misc.3d 371, 374, 933 N.Y.S.2d 541 [NY Cty. SCT 2011].

81. Plaintiffs do not dispute that on January 11, 2012, Robert Galvin was employed as a security guard by MSA Security. MSA Security was hired by Brookfield Properties to provide security for Zuccotti Park. (Exhibit G).

82. Plaintiffs do not dispute that Mr. Galvin had authority to enforce the rules of the park. Plaintiffs dispute that Mr. Galvin had authority to determine who could remain on the premises. (Exhibit G.)

The first of these two statements contradicts the second. Because Mr. Galvin had authority to **enforce** the rules of the Park, he lacked authority to decide, **in violation of those rules**, that members of the public, who were obeying the rules, could not remain on the premises, given that one of the rules was that **the Park was open to the public 365 days a year**. Defendants' Exhibit C at 35:25-36:4 (Exhibit 5 to Plaintiffs' First Amended Complaint is a fair depiction of the rules of the Park posted prior to January 10, 2012); Plaintiffs' Exhibit 2 to Declaration of Paul L. Mills.

Plaintiffs object to Exhibit G, the Affidavit of Robert Galvin, pursuant to FRCP Rule 56 (c)(1)(B)(2) (inadmissible evidence), FRCP Rule 56 (c)(1)(B)(4) (incompetent declaration) and on grounds of hearsay (FRE 801, 802). Because the affidavit states that Mr. Galvin is an employee security guard of a private contractor (MSA) hired in turn by the Park owners (Brookfield Properties), his statements about his authority are simply his formulations of out-of-

court statements by his employers to him about the scope of his duties, offered here for the truth of the matter asserted, and inadmissible as hearsay. Exhibit G at ¶¶ 1-3, FRE 801, 802.

This asserted authority to supersede the posted Park rules, and the court's published opinion in Waller, is the entire basis for Defendants' claim that Plaintiffs were lawfully arrested. Defendants' Memo at 10-11. That, they say, is why their Defendant NYPD officer had probable cause to arrest, despite posted Park rules that said the Plaintiffs were allowed to stay, and the Park's status as a traditional public forum, treated as such by the Waller court, and found by the Waller court to be required by special permit to be open to the public 365 days a year. Defendants cannot prove Mr. Galvin's authority to overrule the local court by Mr. Galvin's self-serving hearsay evidence.

Additionally, Mr. Galvin is asserting his independent legal opinion about the extent of his lawful authority. His Affidavit is inadmissible because it fails to provide a basis for competent testimony on legal matters. Exhibit G at ¶¶ 1-3 (Mr. Galvin is a security guard; no statements about legal training, professional licensure or experience); FRCP Rule 56 (c)(1)(B)(4) (incompetent testimony evidence).

Such expert testimony would be inadmissible anyway, even if it were qualified, because it would be offered in violation of FRCP Rule 56 (c)(1)(B)(2) and FRCP Rule 26 (Defendants failed to designate Mr. Galvin as an expert witness) and the Courts Case Management Plan (providing for no expert witnesses).

Again, Mr. Galvin's full legal authority to supersede the posted Park rules, and the court's published opinion in Waller, and order the Plaintiffs out is the entire basis for the Defendants' claim of a lawful arrest. Defendants cannot prove it by unqualified, inadmissible

expert legal testimony from a Park security guard. FRCP Rule 56 (c)(1)(B)(2), FRCP Rule 56 (c)(1)(B)(4).

The record includes evidence that Zuccotti Park was a traditional public forum, where Mr. Galvin's powers, as a private custodian, over persons engaged in 1st Amendment activity, were limited. Zuccotti Park was a public plaza opened to all forms of public expression. See Plaintiffs' Statement of Fact No. 87, below.

The record includes evidence that the rules of the Park, not his own decisions, controlled Mr. Galvin's authority to decide people were not allowed in the Park. Plaintiffs' Exhibit 2: Posted park rules. (providing that the Park was open all day, every day, and listing only certain specific activities that could be prohibited).


83. Plaintiffs dispute in part that Mr. Galvin saw plaintiffs on park property and told them it was against the rules to lay down. Plaintiffs do not dispute that he asked them to leave several times when they remained lying down, but dispute that this occurred "subsequently" to warnings. (Exhibit G).

The record includes evidence that Mr. Galvin did not tell either Plaintiff that it was against the rules to lay down.  Defendants' Separate Statement at No. 18. Defendants' Exhibit G-1 (Patrol Officer Edwards states that Plaintiffs were warned about not laying down three times by Lt. Feeney; three times by Patrol Officer Edwards; but neither Officer Edwards, nor Mr. Galvin, in his supporting deposition, states that Plaintiffs received any warning about anything from Mr. Galvin.)

84. Plaintiffs dispute that Mr. Galvin informed police officers who informed plaintiffs they were in violation of park rules and needed to exit the park. (Exhibit G).

The record includes evidence that the police officers arrested Plaintiffs without informing them they were in violation of Park rules and needed to exit the park.  Defendants' Exhibit C at 58:11-12 ("No one told me I could not lay down prior to my arrest.")

85. Plaintiffs do not dispute that Mr. Galvin witnessed police officers place plaintiffs under arrest.  Plaintiffs' dispute that the arrest occurred when they refused to comply.  Plaintiffs do not dispute that Mr. Galvin provided his name and contact information to the officers to aid in the prosecution. (Exhibit G).

The record includes evidence that the police officers arrested Plaintiffs without giving them any orders with which to comply. See Plaintiffs' Response to Defendants' Separate Statement at No. 84, above.

86. Plaintiffs do not dispute that Sergeant Imperatrice witnessed Mr. Galvin's orders that plaintiffs exit the park, and plaintiffs failure to exit. (Exhibit E). The record includes evidence controverting Lt. Imperatrice's other ("inter alia") statements, as follows:

(1) Defendants' Exhibit E at ¶¶ 5-8 (heard Custodian Galvin inform Plaintiffs they were in violation of park rules by lying down and heard Custodian Galvin ask them to leave Park premises). See Plaintiffs' Response to No. 83, above.

(2) Defendants' Exhibit E at ¶ 10 (Lt. Imperatrice himself informed Plaintiffs that park security

wanted them to leave the park because they failed to adhere to the Park rules and they

refused to leave.) See Plaintiffs' Response to Defendants' Separate Statement at No. 84,

above.; Defendants' Exhibit G-1 (Patrol Officer Edwards states that Plaintiffs were warned

about not laying down three times by Lt. Feeney; three times by Patrol Officer Edwards; but

neither Officer Edwards, nor Mr. Galvin, states that Lt. Imperatrice said anything to

Plaintiffs.)

**Additional Facts Submitted in Opposition to**

**Defendants' Motion for Summary Judgment{ TC "Additional Facts Submitted in**

**Opposition to Defendants' Motion for Summary Judgment" \f C \l "1" }**

**I. The individual defendant officer arrested Plaintiffs for lawful 1st Amendment Activity in**

**a traditional public forum.{ TC "I. The individual defendant officer arrested Plaintiffs for**

**lawful 1st Amendment Activity in a traditional public forum." \f C \l "1" }**

**A. Zuccotti Park was a traditional public forum{ TC "A. Zuccotti Park was a traditional**

**public forum – No. 87" \f C \l "2" }**

87.     Zuccotti Park was a public plaza, closely resembling a public park, opened to all forms of

public expression. *Waller v. City of New York*, 34 Misc.3d 371, 372-373 (2011), 933 N.Y.S.2d

541, 2011 NY Slip Op 21412 ("It would appear" that Zuccotti Park is a privately-owned public-

access plaza, created 43 years before in 1968 by a special permit and "it is undisputed that the

special permit requires that Zuccotti Park be open to the public and maintained for public use

365 days per year. … It is undisputed that, since its inception on about September 17, 2011,

Occupy Wall Street began occupying Zuccotti Park on a 24-hour basis for the demonstrations.

Occupy Wall Street brought attention to the increasing disparity of wealth and power in the

United States"). Plaintiffs' Exhibit A, Affidavit of Deputy New York City Mayor Cas Holloway

at ¶ 9 (stating that Zuccotti Park is a public plaza, and that the 1968 special permit creating it

"requires that the owner of the plaza (currently Brookfield Properties) maintain the plaza in a

manner that closely resembles a public park in that it must be open to the public and maintained

for public use 365 days per year."

88.     In November, 2011, Occupy began 1st Amendment activities in Zuccotti Park. *Waller v.*

*City of New York*, 34 Misc.3d 371, 372-373 (2011), 933 N.Y.S.2d 541, 2011 NY Slip Op 21412

("It is undisputed that, since its inception on about September 17, 2011, Occupy Wall Street

began occupying Zuccotti Park on a 24-hour basis for the demonstrations. Occupy Wall Street

brought attention to the increasing disparity of wealth and power in the United States").

89.     In January, 2012, Occupy lawyers threatened legal action if the City continued to block

their 1st Amendment activities pursuant to the *Waller* decision.  Exhibit 4 to Plaintiffs' First

Amended Complaint, www.nyclu.org,

http://www.nyclu.org/files/releases/NYCLU_letter_to_LiMandri_1.9.12.pdf

**B. Plaintiffs lay down there lawfully. – Nos. 88-90{ TC "B. Plaintiffs lay down there**

**lawfully. – Nos. 88-90**" \f C \l "3" }

90.     Park rules forbid laying down only if doing so interfered with reasonable use of the Park by others. Plaintiffs' Exhibit 2 to Declaration of Paul L. Mills.

91.     When Plaintiffs lay down in the Park at about 1:30 AM on 1/11/12, there was no one near them. However, the record includes evidence that Plaintiffs were far away from most people in the Park. Defendants' Exhibit C at 75:7-14 (When Plaintiffs lay down, the nearest demonstrator was "far away … away from most people"; closest other person was "more than a car length away.")

**C. Plaintiffs' laying down was an exercise of 1st Amendment assembly rights. – No. 91**{ TC "**C. Plaintiffs' laying down was a form of 1st Amendment expression. – No. 91**" \f C \l "3" }

92.     Plaintiffs' presence in the Park, and laying down there, was for the purpose of 1st Amendment Assembly.  Defendants' Exhibit B Part 1 at 38:20-39:16 (Plaintiff Keegan believed that Zuccotti Park was "special"; a lot of activists came together and "were doing some of the most productive work I had seen them do in my years in New York City"; expression from the Park were "inspiring to me and productive"; he was "trying to figure out where to again congregate and how to continue to share ideas"; thinks that "public space is very important for expressing personal rights and sharing ideas") Exhibit B Part 2 at 98:24-99:11 (encouraged people to lie down in the park because "I wanted to see if we could stay there, if we could do the things that we needed to do to be there"; lying down was "a way to see if you could occupy the

space"; but by the time he actually lay down with Ms. Lebowitz "that question had already been answered for me when I saw so many people lying down earlier in the evening.")

**D. Defendant Edwards arrested Plaintiffs for laying down in the Park, not for laying down in front of a police vehicle. – Nos. 92-94**{ TC "**D. Defendant Edwards arrested Plaintiffs for laying down in the Park, not for laying down in front of a police vehicle. – Nos. 92-94**" \f C \l "3" }

93.     Plaintiffs were arrested for laying down in Zuccotti Park. Defendants' Exhibit G-1 at 1-2 (Defendant Edwards placed Plaintiffs' under arrest for "the offenses described above", i.e., allegedly refusing to comply with repeated requests to leave the Park.

94.     Plaintiffs were not arrested for laying down in front of a police van. See Plaintiffs' Additional Separate Statement No. 93, above.

95.     Plaintiffs were arrested on charges that were not serious, felony, or violent crime charges. See Plaintiffs' Additional Separate Statement No. 93, above.

**II. Police issued orders in violation of the 1st Amendment, and that is what caused Plaintiffs' arrests.**{ TC "**II. Police issued orders in violation of the 1st Amendment, and that is what caused Plaintiffs' arrests.** " \f C \l "2" }

**A. Police were already violating the 1st Amendment, prior to Plaintiffs' arrests. { TC "A. Police were already violating the 1st Amendment, prior to Plaintiffs' arrests. – Nos. 95-97" \f C \l "3" }**

96.     The City had barricaded the Park for weeks after the Waller Court ordered that the Occupy Movement had a right to use the Park for 1st Amendment activity at any hour of the day or night. See Plaintiffs Additional Statement of Fact Nos. 88, 89, above.

97.     Police prohibited people in the Park from lawfully having pieces of cardboard for written expression in exercise of their 1st Amendment rights. Exhibit 6 to Plaintiffs' First Amended Complaint: Shapiro Video.

98.     Police prohibited people in the Park from laying down to assemble together in exercise of their 1st Amendment right of assembly, even though they were not interfering with reasonable use of the Park by anyone else. Defendants' Exhibit G, Declaration of Robert Galvin at ¶ 5, 7, 8 (told Plaintiffs they could not lay down, informed police of their continuing to lay down, police arrested Plaintiffs); Defendants' Exhibit G-1 at 1 (Defendant Edwards, stating in deposition that she observed NYPD Lt. Feeney state three times to a group of people in Zuccotti Park, including Plaintiffs, "IF YOU WANT TO REMAIN IN THE PARK, YOU MAY NOT LIE DOWN IN THE PARK").

**B. Defendant Edwards arrested Plaintiffs for violating the NYPD unlawful order. { TC "B. Defendant Edwards arrested Plaintiffs for violating the NYPD unlawful order. – No. 98" \f C \l "3" }**

99.     Police arrested Plaintiffs for violating unlawful police orders against laying down at all in Zuccotti Park. See Plaintiffs' Additional Separate Statement No. 93, above.

**C. The unlawful NYPD orders were the consequence of an unlawful City practice and policy.{ TC "C. The unlawful NYPD orders were the consequence of an unlawful City practice and policy. – Nos. 99-102" \f C \l "2" }**

100.     The unlawful orders were given within earshot of NYPD executive officers. Exhibit 6 to Plaintiffs' First Amended Complaint: Shapiro Video.

101.     The unlawful orders were given by NYPD executive officers. See Plaintiffs' Additional Statement of Fact No. 98, above.

102.     The arresting officer arrested Plaintiffs for not obeying the unlawful police orders. See Plaintiffs' Additional Statement of Fact No. 93, above.

**D. The City's deliberately indifferent failure to train caused Plaintiffs' false arrests in violation of the 1st Amendment.{ TC "D. The City's deliberately indifferent failure to train**

**caused Plaintiffs' false arrests in violation of the 1st Amendment. – Nos. 103-107" \f C \l "2"
}**

103.    Defendant City knew of the need to train officers not to interfere with bystanders engaged in lawful 1st Amendment activity. *Black v. Codd*, 73 Civ. 5283, Stipulation and Order dated June 1, 1977 (providing for court-enforceable NYPD policy not to arrest observers of arrests)

104.    The City provided the arresting officer with no training about the exercise of 1st Amendment rights in a traditional public forum. Declaration of Paul L. Mills at ¶ 3.

105.    Defendant arresting officer Edwards failed to respect Plaintiffs' 1st Amendment rights when she arrested them.  See Plaintiffs' Additional Statements of Fact Nos. 93, 98, 99 above.

106.    The executive officers present during Plaintiffs' arrests failed to respect their 1st Amendment rights. See Plaintiffs' Additional Statements of Fact Nos. 100, 101, 102 above.

107.    Defendant City's failure to train its police officers about 1st Amendment rights in a traditional public forum caused the violation of Plaintiffs' 1st Amendment rights. See Plaintiffs' Additional Separate Statements of Fact Nos. 104, 105, 106 above.

**E.  Search characteristics of iris photographs.**

108.    NYPD Iris photograph searches gathered unique personal identification from inside the body. Policy materials. Exhibit H-3 at D74 at ¶ 1 ("utilizes the unique characteristics and features of the human iris in order to determine the identity of an individual); D75 at ¶ (the human iris is an internal organ protected by the eyelid, cornea and aqueous humour, part of the eye's "middle coat").

109.    Iris photograph searches gathered information at a microscopic level not detectible by ordinary mugshot photography or the unaided human eye. Exhibit H-3 at D74 at ¶ 4 (information density of 3 bits per square millimeter).

110.    The iris photograph searches immediately stored the iris patterns as digital files in a permanent database. Defendants' Exhibit H-3 at D74 ("This process takes only seconds and captures details of the iris that are mapped, recorded and stored for future matching procedures."; at D77 ("Iris images are stored in the system database for archive purposes."); Defendants' Defendants' Exhibit H-4 at D61 ("the irises of all prisoners will be photographed and entered into the department's database"; at D66 (instructions on reviewing quality of iris capture before submitting record to database, "because it will later be rejected by the database"; at D67 ("Criminal Justice Bureau personnel will use a handheld "Pier-T" iris camera to verify an individual's identity immediately before arraignment. The iris software sends information to zOLPA to confirm whether the individual is a match or mismatch.")

**F. Defendant City's pre-arraignment iris scans were unlawful.**{ TC "**F. Defendant City's pre-arraignment iris scans were unlawful. – Nos. 118-125**" \f C \l "2" }

111.    NYPD conducted the iris scan search procedures at issue in this case. H4 at D61 ¶¶ 1-2, Defendants Statement of Fact No. 40.

112.    NYPD controlled the pre-arraignment detentions of the Plaintiffs. Defendants' Exhibit O (prisoner records of Plaintiffs' detention, each page bearing the NYPD shield).

113.    No statute limited the NYPD iris scan search procedures at issue in this case. Declaration of Paul L. Mills at ¶ 4.

114.    The pre-arraignment iris scans that NYPD officers forced and tried to force the Plaintiffs to submit to were useless for preventing them from switching identities prior to arraignment, because neither Plaintiff had a prior iris scan. Defendants' Statement of Fact No. 30 (both Plaintiffs' refused booking iris scan); Defendants' Exhibit H, at ¶ 15 (without initial photo, subsequent verification by iris scan is impossible).

115.    The pre-arraignment iris scans that NYPD forced and tried to force the Plaintiffs to submit to were unnecessary and unreasonable and arbitrary for preventing them from switching identities prior to arraignment, because they could not function on prisoners seeking to conceal their identity. Defendants' Exhibit H-3 at D77-79 ¶ 3 (iris photography will fail if subject has half-closed eyes, unfocussed eyes, looking aside).

**E. The arresting officer concealed Plaintiffs from their friends and attorney by misstating their names.{ TC "E. The arresting officer concealed Plaintiffs from their friends and attorney by misstating their names. – Nos. 108-115" \f C \l "2" }**

116.    The arresting officer misstated Plaintiff Keegan Stephan's name as "James Stephan". Plaintiffs' Exhibit 6 to Declaration of Paul L. Mills (criminal complaint prepared by Defendant Edwards, misstating Plaintiff's name as "James Stephan").

117.    The arresting officer had Plaintiff Keegan Stephan's passport in her possession prior to misstating Mr. Stephan's name. Plaintiffs' Exhibit 4 (NYPD Property Clerk Invoice dated 1/11/2012 listing Plaintiff Stephan Keegan's passport no. 207053075).

118.    Plaintiff Keegan Stephan's passport stated his name correctly as "Keegan James Stephan." Plaintiffs' Exhibit 3 to Declaration of Paul L. Mills (Plaintiff's passport no. 207053075 stating his name as "Keegan James Stephan").

119.    The arresting officer misstated Plaintiff Claire Lebowitz's name as "Claire Levowitz". Defendants' Exhibit G-1 (Criminal Complaint prepared by Defendant Edwards).

120.    The arresting officer had Plaintiff Claire Lebowitz's driver's license in her possession prior to misstating Ms. Lebowitz's name. Plaintiffs' Exhibit 5 to Declaration of Paul L. Mills (NYPD Property Clerk Invoice dated 1/11/2012 listing Plaintiff Claire Lebowitz's driver's license, New York DMV CID ending 2156 for "LEBOWITZ, CLAIRE").

121.    Ms. Lebowitz's driver's license correctly stated her name as "Claire Lebowitz. Exhibit of license." Plaintiffs' Exhibit 5 to Declaration of Paul L. Mills (NYPD Property Clerk Invoice dated 1/11/2012 listing Plaintiff Claire Lebowitz's driver's license, New York DMV CID ending 2156 for "LEBOWITZ, CLAIRE").

122.    Persons seeking to find out where and when the Plaintiffs were going to be arraigned, including attorneys, were prevented from doing so because the arresting officer had caused the Plaintiffs to be held in custody under false names. Declaration of Heide Jonassen; Declaration of Sarah Baxendell.

123.    Having supportive members of the community present at a defendant's arraignment is of substantial importance in obtain fair and just conditions of release. Plaintiffs' Exhibit 7 to Declaration of Paul L. Mills (New York City Criminal Justice Agency Interview Report, including query, "Expects Someone at Arraignment?"); Declaration of Paul L. Mills at ¶ 7 (stating that criminal court judges rely on such reports when determining conditions of release in the course of arraignment, and the presence of members of the community who know the defendant is significant in obtaining fair and just conditions of release.)

124.    The arresting officer violated Plaintiffs' right to fair and just conditions of release by preventing their friends from being present at their arraignment. See Plaintiffs' Additional Statements of Fact Nos. 116-123 above.

**E. The City's practice and policy of concealing prisoners from their friends and attorneys violated Plaintiffs' rights.**{ TC "**E. The City's practice of concealing prisoners from their friends and attorneys violated Plaintiffs' rights. – Nos. 116-117**" \f C \l "2" }

125.    Police refused to correct their records of Plaintiffs' names when notified of the errors by Plaintiffs. Defendants' Exhibit C Part 2 at 91:2-5; Defendants' Exhibit D Part 1 at 67:23-68:3, 68:13-16.

126.    Police refused to correct their records of Plaintiffs' names even though police were in possession of their government-issued photo ID correctly stating their names. See Plaintiffs' Separate Statements 118 and 120 above.

                    Respectfully submitted,

                    /S/

                    Paul L. Mills
                    LAW OFFICE OF PAUL L. MILLS
                    Park West Finance Branch
                    P.O. 20141
                    New York, NY 10025
                    (646) 637-3693

Dated: July 13, 2013            Counsel for Plaintiffs
New York, NY 10025