UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
CLAIRE LEBOWITZ and KEEGAN STEPHAN,      :
                                         :        12 Civ. 8982 (JSR)
        Plaintiffs,                      :
                                         :        MEMORANDUM ORDER
        -v-                              :
                                         :
THE CITY OF NEW YORK, NYPD PATROL        :
OFFICER ADRIANNE EDWARDS, and NYPD       :
OFFICER DOES 1-10,                       :
                                         :
        Defendants.                      :
----------------------------------------x



JED S. RAKOFF, U.S.D.J.

        Plaintiffs Claire Lebowitz and Keegan Stephan bring this action

under 42 U.S.C. § 1983 against the City of New York, NYPD Patrol

Officer Adrianne Edwards, and NYPD Officer Does 1-10 (collectively,

the "City"), asserting claims for violations of their First, Fourth,

Sixth, and Fourteenth Amendment rights, including a *Monell* claim for

municipal liability. These claims all relate to the plaintiffs'

arrest in Zuccotti Park on January 10, 2012, and their treatment

immediately thereafter. Zuccotti Park is a privately owned public

space owned and maintained by Brookfield Properties.

        Plaintiffs allege that (1) they were falsely arrested for

trespass for lying down in the park when posted park rules only

prohibit "[l]ying down on the ground, or lying down on the benches,

sitting areas or walkways by others"; (2) that their arrest violates

the First Amendment, because the restriction on their speech is not

substantially related to an important government interest and is not

narrowly tailored; (3) that defendants violated plaintiffs' Sixth

1

Amendment right to counsel by misspelling their names upon booking, impeding the ability of counsel, friends, and family to find plaintiffs in the system and appear with them at their arraignment; (4) that defendants violated plaintiffs' substantive due process rights by delaying their arraignment as punishment for refusing to submit to an iris scan; and (5) that the foregoing constitutional violations were a result of City practices and policies, subjecting the City to liability under *Monell*.

Following briefing and argument, the Court, by Order dated November 11, 2013, granted defendants' motion for summary judgment in defendants' favor on all claims. This Memorandum Order states the reasons for that ruling, and directs the entry of final judgment dismissing the complaint in its entirety. Specifically: (1) With respect to the false arrest claim, the undisputed evidence shows that the arrest for trespass was sufficiently supported by the security guard's statement to the police that the plaintiffs were not complying with park rules and refused to leave when asked. (2) With respect to the First Amendment claim, lying down in a private park in the middle of the night apart from other people is not expressive conduct protected by the First Amendment. (3) With respect to the Sixth Amendment claim, the right to counsel attaches at arraignment, during which plaintiffs were provided with counsel. (4) With respect to the substantive due process claim, the undisputed evidence shows that the delays in arraignment were a function of a medical emergency and other innocent causes. (5) With

respect to the *Monell* claim, it cannot survive the dismissal of the other claims.

Unless otherwise noted, the following facts set forth in Defendants' Rule 56.1 statement ("Defs' 56.1") and/or Plaintiffs' Rule 56.1 statement ("P.'s 56.1"), and supported by the evidence there cited, are not disputed.

On the evening of January 10, 2012, the barricades that had previously surrounded Zuccotti Park in the wake of the "Occupy Wall Street" activity were taken down. Defs' 56.1 ¶ 1. Plaintiffs Lebowitz and Stephan separately learned that this had happened, and separately proceeded to the park. *Id.* ¶¶ 2-3. Before coming to the park, Stephan tweeted to others to gather at the park and "retake" it. *Id.* ¶ 4. Both plaintiffs were aware of posted park rules, which state, *inter alia*, "The following types of behavior are prohibited in Zuccotti Park . . . . Lying down on the ground, or lying down on benches, sitting areas or walkways which unreasonably interferes with the use of benches, sitting areas or walkways by others." *Id* ¶ 5. On arrival at the park, Lebowitz lay down in the park with a group of about five people. *Id.* ¶ 7. Stephan was also in the park at this point and was encouraging people to lie down. *Id.* ¶ 10. Both plaintiffs then left the park and proceeded to a nearby bar, where they discussed lying down in the park. *Id.* ¶ 11.

Plaintiffs returned to the park later that evening. Lebowitz found an area removed from where other protestors in the park were gathered and lay down. *Id.* ¶ 13. She was shortly joined by Stephan,

who lay down next to her. *Id.* ¶ 14. Within fifteen minutes, the plaintiffs were approached by a security guard, Robert Galvin, who told them, at least three times within a minute, to leave. *Id.* ¶ 15. Plaintiffs testified to not recalling any other material contents of the interaction with the security guard at that time. *Id.* ¶ 16, 18-22. They do, however, dispute the testimony of the security guard that he also told plaintiffs that it was against park rules to lie down in the park. *Id.* ¶ 83. Despite the repeated directions to leave by the security guard, plaintiffs remained where they were. *Id.* ¶ 17. The security guard states that he then told police that plaintiffs were in violation of park rules and needed to exit the park.[1] *Id.* ¶¶ 84-86. Plaintiffs were then placed under arrest. *Id.* ¶ 24.

On arrival at the police van, plaintiffs went limp and lay down on the sidewalk. *Id.* ¶ 25. They were then transported to the Seventh Precinct, and ultimately arrived at Central Booking at around 10:45 a.m. *Id.* ¶¶ 28-29. When plaintiffs were enrolled, their names were misspelled. Lebowitz's last name was listed as "Levowitz," and Keegan James Stephan's name was listed as "James Keegan." Pls.' 56.1 ¶¶ 118-121. Stephan used a phone at Central Booking to call a friend, who reached out to Stephan's attorney. *Id.* ¶ 33. Lebowitz did not call for an attorney, but knew that a representative from the National Lawyers guild was being sent for her arraignment. *Id.* ¶

---

[1] Plaintiffs contest this fact, but have asserted no evidentiary basis for doing so.

34. At their arraignment, both plaintiffs were represented by counsel. *Id.* ¶ 35.

Upon booking, both plaintiffs refused iris scans. Defs.' 56.1 ¶ 30. The NYPD iris scan program was started in November 2010 in response to at least six prisoner escapes in 2009-2010, where individuals posed as other prisoners in order to gain release at arraignment.[2] *Id.* ¶ 63. Iris scans are high resolution photographs of the pigmented portion of the eye, and are more accurate than fingerprints in confirming identity. *Id.* ¶ 62. Since the advent of the iris photo program, no prisoners have escaped by posing as another individual at arraignment. *Id.* ¶ 63. Under the program, an iris photo is taken upon entry to Central Booking, and compared to a photo taken at arraignment. *Id.* ¶ 67.

Stephan was brought to a courtroom for arraignment on the evening of January 11, 2012, and was allegedly told that he had to submit to an iris scan at that time or he would be sent back downstairs. *Id.* ¶¶ 36-37. Stephan is not sure whether he informed the officers that he had refused to submit to an initial iris scan upon booking. *Id.* ¶ 42. Nevertheless, Stephan then submitted to an iris scan and was seated in the courtroom. *Id.* ¶ 40. The officer attempting to perform the scan then had trouble, and attempted to take several photos of Stephan's iris. *Id.* ¶¶ 41-42. Stephan's record shows that an attempt to make an iris scan was made, but no

---

[2] Although plaintiffs contest this statement on hearsay grounds, the Court admits this statement because it is supported by a sworn affidavit made on the basis of personal knowledge, and thus is by law, not hearsay. *See* Declaration of Andrew Lucas dated June 28, 2013, Exhibit H.

successful scan was recorded. *Id.* Stephan was arraigned and released at approximate 11:28 p.m., about five minutes before the end of night court. *Id.* ¶¶ 43-44.

Lebowitz was brought to a different courtroom for arraignment on the evening of January 11, 2012 at around 7:00 p.m., along with around ten other prisoners. *Id.* ¶¶ 46-47. When asked to submit to an iris scan, Lebowitz refused, and was seated with other prisoners awaiting arraignment. *Id.* ¶ 48. While Lebowitz was waiting, a prisoner sitting next to her had a seizure and had to be taken from the courtroom by medical personnel on a gurney. Courtroom proceedings stopped during this medical emergency. *Id.* ¶ 49. Later, Lebowitz and the other prisoners were taken downstairs while the court took a break for dinner. *Id.* ¶ 50. When the prisoners returned to the courtroom after dinner, Lebowitz alleges that she was told that she would be brought back to a cell if she did not submit to an iris scan. Lebowitz does not recall if she told the officers that she had refused the earlier scan. *Id.* ¶ 54. She refused the current scan, and ultimately was told to sit with the other prisoners awaiting arraignment. *Id.* ¶ 53. Lebowitz was not arraigned that night, and was returned to her cell, along with other prisoners. *Id.* ¶¶ 52, 55. At 1:00 a.m., Lebowitz's record was marked "DHO," which means "docketed hold over," a designation for prisoners who are brought to be arraigned but later returned to their cell. *Id.* ¶ 72. Lebowitz was later arraigned the next morning and ultimately released at about 9:30 a.m. on January 12, 2012. *Id.* ¶ 57.

6

Plaintiffs' first claim is that they were falsely arrested. However, "[t]here can be no federal civil rights claim for false arrest where the arresting officer had probable cause. Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton Cnty.*, 63 F.3d 110, 118 (2d Cir. 1995).

Here, plaintiffs were aware of a park rule prohibiting "[l]ying down on the ground, or lying down on benches, sitting areas or walkways which unreasonably interferes with the use of benches, sitting areas or walkways by others." Defs.' 56.1 ¶ 5. Plaintiffs do not dispute that they lay down in the park together, that Lebowitz heard a security guard tell them to leave the park multiple times, that they remained lying down, and that they were arrested following these events. It is well established that "it is unlawful to remain on the premises after being personally given a lawful order to depart." *Berger v. Schmitt*, 91 F. App'x 189, 190 (2d Cir. 2004). Asking a plaintiff to leave "withdr[a]w[s] Plaintiff's permission to remain there legally," so that "[w]hen [the] Plaintiff d[oes] not leave, she [i]s guilty of trespass." *Faruki v. City of New York*, No. 10 Civ. 9614 LAP, 2012 WL 1085533 (S.D.N.Y. Mar. 30, 2012), *aff'd*, No. 12-1750-Cv, 2013 WL 452536 (2d Cir. Feb. 7, 2013).

Plaintiffs' only colorable argument is that it is not against park rules to lie down in the park in a way that does not

7

unreasonably interfere with the use of the park by others. However, the rule could easily and reasonably be read to prohibit all lying down on benches and walkways *because* such conduct unreasonably interferes with the use of the park by others. In any event, whether plaintiffs were in compliance with the park rules or not, the fact remains that they were asked to leave by the park's custodian, the security guard. By telling the plaintiffs to leave, the security guard withdrew plaintiffs' permission to stay; when the plaintiffs then stayed anyway, they committed trespass, regardless of how the park rules might otherwise be interpreted.

Furthermore, even if the plaintiffs were not violating park rules, even if the security guard somehow lacked authority to tell plaintiffs to leave, and even if the security guard had never even told the plaintiffs to leave, the police were nevertheless entitled to rely on the security guard's representation that the plaintiffs were trespassing by remaining in the park without permission. "An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." *Singer*, 63 F.3d at 119. Here, the security guard was known to the arresting officers, he provided his personal information to the police, and he signed a sworn statement stating that the plaintiffs did not have permission to remain in the park. Defs.' 56.1 ¶ 85. The

police thus had no reason whatsoever to doubt the security guard's veracity.

Plaintiffs' next claims are for violations of their First Amendment rights and for retaliation for exercising those rights. As to the First Amendment violation claim, lying down in a park at night removed from other people does not qualify as speech and expressive conduct protected under the First Amendment. Conduct is expressive and subject to First Amendment protection only when it is intended to express an idea and when the conduct is performed in a context where that idea could be understood by others. *See Spence v. State of Washington*, 418 U.S. 405, 409-410 (1974) (per curiam). The plaintiffs admit that before they lay down, they deliberately removed themselves from other people around them in the park. Thus no First Amendment violation occurred.

Plaintiffs' First Amendment retaliation claim likewise fails. "In order to state a retaliation claim, we require a private citizen to show: '(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right.'" *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010). As to the second element, defendants have proffered no competent evidence that defendants' actions were motivated by plaintiffs' exercise of their speech and association rights. To the contrary, plaintiffs do not dispute that they were permitted to be present in the park without incident

9

before their arrest, and were arrested only after they lay down, were asked to leave, and refused to do so. The evidence thus shows beyond genuine dispute that defendants were motivated by plaintiffs' failure to leave when asked, and not their speech or associative conduct. As to chilling, there exists a similar failure of proof. Plaintiffs do not dispute that they have attended numerous Occupy Wall Street protests and actions since these incidents, and their arrest has not caused them to fail to attend any such event or protest.

Plaintiffs' complaint also includes a Sixth Amendment claim that defendants prevented and delayed plaintiffs' meeting with their attorneys. However, the Second Circuit has held that "a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversarial judicial proceedings have been initiated against [the person]. The instances in which the initiation of adversarial proceedings have been found to give rise to a [S]ixth [A]mendment right to counsel include formal charge, preliminary hearing, indictment, information, or arraignment. The Court, however, has never held that [S]ixth [A]mendment right to counsel attaches at the time of arrest." *United States v. Smith*, 778 F.2d 925, 931-32 (2d Cir. 1985). Here plaintiffs do not dispute that counsel appeared alongside plaintiffs at their arraignments. Defs' 56.1 ¶¶ 33-35. Moreover, Stephan was permitted to telephone for a friend to obtain counsel and Lebowitz chose not to make a call because she knew counsel would be present at the arraignment. Thus

10

when adversarial proceedings commenced, plaintiffs were represented and no Sixth Amendment violation occurred.

Plaintiffs also bring a claim under the Fourteenth amendment, alleging that defendants deprived plaintiffs of due process of law by punishing them for refusing to submit to an iris scan. To the extent plaintiffs are making a substantive due process claim, it is well established that only state actions that are "arbitrary and outrageous", *Kuck*, 600 F.3d at 167, and "shock the conscience," *Bryant v. City of New York*, 404 F.3d 128, 134 (2d Cir. 2005), will support a substantive due process claim. Neither plaintiff can claim remotely outrageous conduct towards them related to the iris scans, as neither plaintiff suffered any constitutionally violative treatment as a result of the iris scan program. Stephan does not allege that he was injured in any way by submitting to an iris scan; the officers attempted to take a scan for a minute, which did not hurt or medically harm him in any way, and which caused no material delay in his arraignment. As for Lebowitz, she refused two iris scans and was seated to be arraigned along with other prisoners. Court proceedings only stopped when an individual next to Lebowitz suffered a seizure, and later stopped again for dinner. Lebowitz was not arraigned that night, but was marked DHO, or docketed "hold over," and then was arraigned first thing the next morning. The record thus shows that any delay in Lebowitz's arraignment was due, not to her refusal to take an iris scan, but rather the medical emergency in the courtroom and the dinner break. Indeed, the records

indicate that two other prisoners enrolled after Lebowitz were brought to the courtroom with Lebowitz, and were ultimately arraigned with her the next morning. In any event, Lebowitz was arraigned well within forty-eight hours of her arrest, which is presumptively reasonable. *See Bryant*, 404 F.3d at 137 ("[A] jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of [*Gerstein v. Pugh*, 420 U.S. 103, 105 (1975)]. Thus, prompt generally means within 48 hours of the warrantless arrest.").

Finally, plaintiffs' complaint includes a *Monell* claim for municipal liability. To hold a municipality liable under Section 1983 for the unconstitutional acts of its employees, a plaintiff must show (1) that the alleged actions of the employees were the result of a specific policy, custom, or practice, (2) that the policy, practice, or custom caused the plaintiff's injuries, and (3) that those injuries constituted a violation of the plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691-94 (1978). Here, no *Monell* claim can survive, for two reasons. First, there was no underlying constitutional violation. Second, plaintiffs do not point to any other instances, and thus cannot show a policy, practice, or custom as a matter of law. To the extent that defendants have failed in training, plaintiffs can point to no nexus between training failure and injuries sustained.

For all the foregoing reasons, the Court, by Order dated November 11, 2013, granted defendants' motion for summary judgment. The Clerk of the Court is directed to enter final judgment dismissing the complaint.

Dated:   New York, NY
         February 24, 2014

_____
JED S. RAKOFF, U.S.D.J.

13